Burks, J.
This is a writ of error awarded the plaintiffs in error to a judgment of the circuit court of Floyd county, rendered against them on behalf of the defendant in error in an action for malicious prosecution.
There was a general demurrer to the declaration, which was overruled, and the parties went to trial before a jury, on issue joined on the plea of “not guilty,” which resulted in a verdict for the plaintiff (defendant in error here) of $1,000,. as award for damages; ujjon which verdict, and in accordance therewith, the judgment aforesaid was rendered.
In the course of the trial the defendants tendered *four bills of exceptions *279 to the rulings of the court, which were signed, sealed, and made a part of the record.
The first three are to the exclusion by the court of certain evidence offered by the defendants, and the fourth and last is to the refusal of the court to set aside the verdict of the jury and grant them a new trial, on a motion based upon the ground that the verdict was contrary to the law and the evidence.
There are six counts in the declaration. The last five substantially allege that the defendants maliciously and without probable cause procured the plaintiff to be charged with and prosecuted for felony, in that he did feloniously pass, utter, &c., a false, .forged and counterfeited United States treasury note of the denomination of fifty dollars, well knowing the said note to be false, forged and counterfeited, with intent to defraud, &c., setting out the complaint, warrant, arrest thereunder, examination, indictment, trial, imprisonment during the prosecution, verdict of acquittal by the jury, and final discharge by the Federal court, in which the trial was had; and further alleging that heavy and enormous costs had been incurred by the plaintiff in defence of the prosecution, &c.
The first count differed from the other five only in alleging that the grievances complained of were directly committed by defendants, instead of being instigated and procured by them as in the other counts alleged.
The declaration seems to have been carefully and skillfully drawn, and I think the demurrer, which was not argued before this court at all, was properly overruled.
On the trial before the jury, the plaintiff introduced *as a witness one John Walsh, a United States commissioner for the western district of Virginia, who testified that he issued the warrant for the arrest of the plaintiff on the sworn complaint of one George E. Smith; that the plaintiff was arrested on that warrant, examined and recognized by him to answer an indictment in the United States court; and that he had retained the complaint and sent the warrant, with a statement of the evidence of the witnesses who testified on the examination, to the clerk of the United States court at Abingdon.
“On cross-examination (of Walsh), the defendants asked him who were the witnesses before him. He replied, J. M. Boyd and Mr. Scott (the defendants). *, * * Witness said he took Boyd’s testimony in writing, which he filed in the papers in the case. Defendants then showed witness a paper taken from the files in the case, and asked him if that was the paper referred to. He said it was. Thereupon the defendants’ counsel asked the witness. ‘What was the conduct of J. M. Boyd (who was one of the defendants) before him, and whether he manifested any anxiety on the subject of the prosecution?”’ The plaintiff, by his counsel, objected to the answering of this question by this witness. The court sustained the objection, and gave as a reason for doing so, “that it was not a proper question to be asked by the defendants and have answered on cross-examination.” To this ruling the defendant’s first bill of exceptions was tendered and made a part of the record.
Evidently the court did not exclude the answer to the question propounded for the reason that it was incompetent and irrelevant evidence, but because the question was, in the opinion of the court, asked at an improper stage of the examination. The paper, which *had been shown to the witness for the purpose of identifying it, had not been offered in evidence. It contained what purported to be the testimony of the defendants as taken down by the witness on the examination of the plaintiff before him. The defendants, after asking whether the defendants testified at the examination, then propounded the question objected to. It seems to me they should have waited until the testimony contained in the paper had been offered by the plaintiff. The demeanor of the defendant Boyd, if a proper subject of inquiry at all, would have been more appropriately inquired into after it had been shown what his testimony was. At all events, as I construe the bill of exceptions, the answer was only excluded because the question was out of time. It appears, from the evidence set out in the fourth bill of exceptions, that the testimony of the defendant, Boyd, before the commissioner, as contained in the paper referred to, was, at some time during the trial, read in evidence to the jury. No doubt if, after the paper had been so offered and read, the defendants had renewed their question, the answer would have been admitted.
The general course of examination of witnesses in judicial proceedings is, and must of necessity be, for the most part, subject to the discretion of the presiding judge; and the exercise of such discretion will never be controlled or interfered with by an appellate court, unless it plainly appears that some injustice has been done. Brook v. Wilcox, 11 Gratt. 411.
I do not think that any injustice has been done to the defendants in this matter, and no error has been committed in the ruling complained of.
The defendants’ second bill of exceptions states that, on the trial, the plaintiff introduced a witness, *H. Alderman, who testified that he was a deputy marshal, and as such arrested the plaintiff. On cross-examination, the defendants’ counsel asked the witness the following question: “When you were on the way to arrest Shelor (the plaintiff), in July 1873, did you see Scott and Boyd (the defendants); and if so, did they or not manifest any anxiety for the prosecution to be carried on?” íhis question was objected to by the plaintiff’s counsel, and the court said that the witness might state the acts and conduct of Scotl- and Boyd, but not their declarations; and to this refusal of the court to permit the question to be answered, except as qualified by the court, the defendants excepted. It does not appear that the question, as limited by the court, was asked, or any answer given.
The declarations of a party are not, in general, admissible as evidence in his own favor; they are so admissible, however, *280 when thej? are a part of what is called the res gestee. In a late English treatise of great excellence, condensing and illustrating the rules of evidence in admirable style, the author tersely states- the rule thus: When any act done by any person is a fact in issue, or is relevant to the issue, the following facts (among others) are relevant — that is to say, all statements made by or to that person accompanying and explaining such act. Stephens’ Digest of the.Raw of Evidence, ch. 2, art. 7, and note 5. art. 3. To come within the terms and operation of the rule, the declarations must accompany and explain an act done, which is a fact in issue or is relevant to the issue. Manifestly the sole object of the question propounded to the witness was to draw from him a narrative statement given by the defendants of something which had previously taken place, or some expression or indication of the present feeling or purpose of the defendants *unconnected with any act then done which was a fact in issue or relevant to the issue. Hence, as soon as the declarations were excluded, all inquiry into the acts and conduct of tne parties, allowed by the court, as tending, in its opinion, I suppose, to show their then disposition touching the prosecution, was dropped. I think the declarations were properly excluded; and if the court had gone further, and absolutely refused to allow answer to the question, even to a limited extent, I am not prepared to' say it would have been error. The prosecution had commenced. The warrant was in the hands of the officer for service, beyond the control of the parties, and no act or declarations of theirs would then be admissible, as it seems to me, when offered as evidence_ by themselves, to prove that the prosecution then in progress had not been set on foot maliciously and without probable cause. As to res gestee, see further 1 Greenleaf’s Ev., § 108, 110; Haynes v. Commonwealth, (Virginia Law Journal, June No., 1877), to be reported in 28 Gratt.
In the further progress of the trial, a witness, Jackson Huff, one of the jury that tried the plaintiff on the indictment, after testifying, without objection, it would seem, that the jury had deliberated from one to two hours on the question of the guilt or innocence of the plaintiff, was thereupon asked by the counsel of the defendants, “if, in considering their verdict, the jury, or he as a juror, took into consideration the rule of law that the prisoner was entitled to the benefit of a reasonable doubt, and if they were induced by said rule of law to render a verdict of not guilty?” The answer to the question, on objection by plaintiff’s counsel, was excluded; and the exclusion was the ground of the defendants’ third bill of exceptions.
*In Smith v. McDonald, Lord Kenyon is represented as saying, that if 'the evidence on the indictment was such as-to make the jury pause, he would hold it .probable cause; but this, of course, must be understood of their doubting on the evidence, where it is legal, and has no reference 'to the case where the evidence is afterjvards shown to be corrupt. 1 Amer. Lead. Cases, 217; 3 Esp. R. 7.
In 1 Hilliard in Torts, ch. 16, § 28, it is said: “It has been held that if the jury in the former trial entertained sufficient doubts upon the evidence to induce them to pause before rendering a verdict of acquittal, this is sufficient evidence of probable cause. (Smith v. McDonald, supra, and other cases cited.) The principle, however,” continues the author, “is usually stated with great qualification. And in late cases it has been distinctly decided that the opinion of the jury on the former trial is not material; and that, although an action cannot be maintained unless the plaintiff has been fully acquitted, and a nolle prosequi is not sufficient, the plaintiff is -not bound to prove that he was acquited by the jury promptly, with out hesitation, delay or deliberation.” See cases cited by the author.
If the deliberation of the jury on the former .trial is evidence at all o-f probable cause (which seems very doubtful from these authorities), and that fact may be proved, I should be unwilling to extend the rule so far as to allow enquiry to°be made of the jury, or any of their number, as to whether such deliberation was the result of doubt as to the guilt or innocence of the accused. Such evidence, at best, would be most unsatisfactory, and should not be allowed to influence the minds of any jury in determining the question of probable cause. The chief, if not the only object of *introducing the verdict on the former trial, is to show that the prosecution is ended; and if the verdict of acquittal is evidence at all oí the want of probable cause, it must be very slight and inconsiderable. I do not think any error was committed by the circuit court in refusing to allow an answer to be given to the question put to the witness.
This brings me to the fourth and last bill of exceptions taken by th'e defendants to the refusal of the court to set aside the verdict of the jury and grant them a new trial on their motion, based on the ground that the verdict .was against the law and the evidence.
To have warranted the verdict of the jury, which was jointly against the defendants, it must have been proved on the part of the plaintiff — ■
First. That the prosecution alleged in the declaration had been set on foot and conducted to its termination, and that it ended in the final acquittal and discharge _of the plaintiff.
Second. That it was instigated and procured by the co-operation of the defendants.
Third. That it was without probable cause.
Fourth. That it was malicious.
Upon an examination of the bill of exceptions, it is quite plain that the judge, for the most part, certifies the evidence given on the trial, not the facts proved by the evidence. The bill, it is true, purports to certif3r what was “proven” in detail, and concludes with the statement, “these being all the facts proven,” &c.; but a careful scrutiny of the whole bill shows that in many particulars what is certified as “proven” is merely what the witnesses said. Moreover, it distinctly *281 appears that the evidence was more or less conflicting on material points. For example, after two witnesses had testified as to statements made by the ^defendant Scott, it is certified that “Scott, when he testified, denied the allegations of both of these witnesses.”
Considering and treating the bill, therefore. as containing a certificate of the evidence given, rather than of the facts proved, this court will not reverse the judgment of the court below, unless, after rejecting all the parol evidence of the defendants and giving full faith and credit to that of the plaintiff, the decision .of the court below still appears to be wrong. Read’s case, 22 Gratt. 924, 928, 929, and cases there cited.
Applying this rule, rejecting all the parol evidence of the defendants, and giving full faith and credit to the evidence of the plaintiff, does the decision of the court below still appear to be wrong? In other words, were the jury warranted, upon the plaintiff’s evidence alone, giving to it full faith and credit, in rendering the verdict which they did render?
First: To maintain the issue joined on his part, it was incumbent on the plaintiff, as before stated, to prove that he had been prosecuted for the offence alleged in the declaration; that the prosecution was ended, and had ended favorably to him. These facts were all proved. There is no dispute about them. He was charged with a felony, in passing a counterfeited United States treasury note of the denomination of fifty dollars, well knowing the same to be counterfeited, with intent to defraud, &c. Upon this charge he was arrested, examined, indicted. tried, acquitted and discharged.
Second: Was this prosecution instigated or produced by the defendants (plaintiffs in error here), and by their co-operation? To warrant the joint verdict, there must have been a joint wrong. The guilt of one only *of the two defendants, however clearly proved, would not have authorized a verdict against both. To support such a verdict, the evidence must have shewn that the two co-operated in the procurement or instigation of the prosecution. Did they instigate the prosecution and did they cooperate in doing so?
The evidence shews, that one George D. Smith, on the 21st day of May, 1873, made a complaint in writing on oath before John Walsh, a commisisoner of the United States for the western district of Virginia, “that William B. Shelor (the plaintiff), of Floyd county, Va., did, on or about the 17th day of May. 1873, or during said month of May, 1873, knowingly and willfully pass upon James M. Boyd (one of the defendants), of Jacksonville, Va., a counterfeit of a U. S. treasury $50 note, receiving therefore its face value.” Such is the tenor of the sworn complaint of Smith, which was produced and shewn in evidence. Upon this complainant, thus made, and on the day of its date, Walsh issued a warrant for the arrest of the plaintiff. It was placed in the hands of a deputy marshal of the United States for service. It appears not to have been executed until the 20th July, 1873. The plaintiff, when arrested, was taken before Walsh and examined by him; each of the defendants, who had been summoned for the purpose, appearing and testifying against the plaintiff. The examination resulted in recognizing the plaintiff for his appearance before the district court of the United States, at Abingdon, to answer an ¡ indictment; and the prosecution, thus commenced, was conducted to final trial, ending, as before stated, in the plaintiff’s acquittal by the jury and discharge by the court.
Why did Smith make this complaint? Was he possessed of any knowledge or reliable information as to *the facts to which he made oath so positively? If so, when, how, from whom, and under what circumstances, did he obtain such knowledge or information? The evidence furnishes the answer to these questions.
I shall, in this connection, refer only to such parts of the evidence as tend to show how and by whom the prosecution was set on foot.
It appears, that Scott & Boyd (the defendants), were merchants and partners, and sold goods at their storehouse in Floyd county. Boyd was the son-in-law of Scott. The plaintiff (Shelor), lived in the same county. In the month of March, 1873, Shelor, in the course of some dealings at the store of Scott & Boyd, the particulars of which will be hereafter noticed in a different connection, passed to Boyd (one of the firm), a fifty dollar treasury note of the United States. This note having been taken by Boyd to Baltimore. and its genuineness there questioned, he informed Shelor of the fact, and Shelor promised to take it back. A short time afterwards, (Shelor saw Boyd again, and not having the money with which to take up the note, asked that it be surrendered to him, as he was going to Lynchburg and Í would have the note examined there, and ¡ he would give Boyd his due bill for it and pay it on his return from Lynchburg. Boyd refused to do this, and thereupon Shelor became very angry, and used abusive language towards Boyd and the 'Scott family, telling him (Boyd) that he.took the note on'his own responsibility — to “crack his, whip,” &c. This, occurred on the 17th day of May. On the very next day, Scott wrote to George W. | Henderlite. a United States collector of in-1 ternal revenue, who resided at Marion, in . Smyth county, one hundred miles distant from Floyd Court-house where he (Scott) resided. That letter was not produced on the trial, but according *to the statements of Henderlite and Smith. the former handed it to the latter, and the latter to Walsh, the commissioner, and that was the last seen of it. Henderlite and Smith say that it was a letter on business. Smith says, that “in the latter part (of the letter), in a few lines, Matthew Scott mentions Wm. B. Shelor having passed a fifty dollar counterfeit note in the store of Scott & Boyd, upon one of the firm of their clerk.” Henderlite says it was “a letter- *282 from Matthew Scott on business connected with the office, in which he complained of persons passing counterfeit money,” and that he referred the letter to Smith, who was his deputy, “to have the matter investigated.” Henderlite and Smith both say that the letter did not recommend or suggest any prosecution against Shelor. Upon the information contained in this letter,. Smith says he based the complainant which he made, and to which he made oath. It is to be observed that this letter was written, as. before stated, on the 18th of May. The distance it had to travel was one hundred miles. It probably did not reach Hender.lite under a day or two, and Smith’s complaint and the warrant were both dated on the 21st of May, so that ¡Smith had very little time “to have the matter investigated.” indeed, the only investigation it seems he proposed was upon a warrant on a charge of felony before a United States commissioner, based solely on the information contained in Scott’s letter. It was open to the observation of the jury that this letter, which was a most important piece of evidence, was not produced, and as it was the groundwork of the prosecution it ought to have been carefully preserved. Nor could it have escaped, the scrutiny of the jury that the written complaint of ’¡'Smith bears internal evidence of the fact that Scott’s letter, which gave him the only information he had, must have contained more information than the witnesses seem to have remembered, else how was it that Smith was enabled to swear that the counterfeit note was passed “on the 17th of May,” or sometime during the month of May? It will be remembered that the 17th of May was the day on which Shelor abused Boyd and the Scott family, and told Boyd to “crack his whip.” Smith knew nothing of this. Scott wrote the next day, and this date (17th of May) must have been referred to in Scott’s' letter in connection with the note, which he said in his letter Shelor had passed to Boyd. Again, Smith in his complaint swears positively that Shelor knew the note was a counterfeit at the time he passed it to Boyd. He says the only information- he had, and on which he based the complainant, was obtained from Scott’s letter. Now it. is perfectly apparent that Scott must have in some way referred in his letter to what passed between Shelor and Boyd on the 17th of May, for that date mentioned in the complaint shows it. Having stated, as he must have done, what occurred on that day, or- some part of what occurred, is it an unreasonable inference that Scott gave in his letter the same account which Boyd gave in his testimony before the United States commissioner? Boyd then stated that Shelor, on the 17th of May said that he knew the note was counterfeit when he let him (Boyd) have it. It was moreover proved in the case that Scott had said “Shelor had. abused his family about that note; that he, Scott, had written to a revenue officer about it, and he reckoned he never would hear anything more about that note that Shelor had been arrested and would be *tried; that when Boyd told him (Scott) about Shelor cursing him, he' told Boyd to. let that alone, he (¡Scott) would attend to that.”
It was further proved that “on the trial at Abingdon, Boyd admitted that he told Captain Shelton in a private conversation, that he would not have set the prosecution on foot if Shelor had not abused the Scott family. It was also proved that he made the same declaration to other persons that he made to. Shelton.” Now here is an unqualified admission by Boyd that he set the prosecution on foot because Shelor abused the Scott family; and the evidence as we have seen, was quite sufficient to show that Scott, operated upon by the same motives, cooperated with his son-in-law.
Third. Was the prosecution without probable cause?
Although the allegation of want of probable cause in the declaration in actions for malicious prosecution is negative in its character, yet it must be proved, or the plaintiff must fail. This rule, based upon considerations of public policy, is well settled, and need not be dwelt upon.
Mr. Justice Washington, in the case of Munns v. Dupont &c., 3 Wash., C. C. 31, 1 Amer. Lead. Cases 200, defines probable cause, in a case of criminal prosecution, as follows: “A reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offence with which he is charged.”. This is said to be one of the best definitions ever given, and has been frequently applied, 1 Amer. Lead. Cases 213; Spengler v. Davy, 15 Gratt. 381, 388. It has been held, in some cases, that probable cause has reference rather to the state of fact as it respects the person prosecuted, than to the degree of knowledge of that fact in the party prosecuting; *and so it seems to have been stated by Judge Tucker, in Mowry v. Miller, 3 Leigh 561. This proposition, however, is combatted by Judge Daniel in his opinion in Spengler v. Davy, supra, in which opinion the other judges concurred. The true doctrine, as it seems to me, and that which is supported by the greatest weight of authority, is declared by the supreme court of United States in the case of Wheeler v. Nesbitt, 24 How. U. S. R. 544, where it is held that “probable cause is the existence of such facts and circumstances as would excite the belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted.”
The like doctrine' is elsewhere stated in somewhat different terms thus: “Probable cause for instituting a prosecution, is held to be such a state of facts known to and influencing the prosecutor, as would lead a man of ordinary caution and prudence, acting conscientiously,, impartially, reasonably, and without prejudice, upon the facts within the party’s knowledge, to believe or entertain an honest and strong suspicion that the person *283 accused is guilty.” 1 Hilliard on Torts, ch. 16, § 18, and cases there cited.
I proceed to inquire whether the defendants, Scott & Boyd, at the time they instigated or procured the prosecution of the plaintiff for the offence of which he was charged, believed the plaintiff to be guilty, and whether such belief was warranted by the facts and circumstances then within iheir knowledge, taking them to be men of ordinary caution, prudence and judgment?
The evidence which can be regarded by this court, and to which full faith and credit must be given, shows that some time in March 1873 the plaintiff *Shelor went “to Floyd courthouse and purchased a small article at Scott & Boyd’s store, and offered to pay for it with a two-dollar note. In getting out his money. Boyd saw Shelor have a fifty-dollar note, and proposed to sell him goods for it or to give him small change, as he, Boyd, was about io go to Baltimore to buy goods. Shelor said he wanted no goods, and said the note had been disputed, and asked Boyd what he thought of it Boyd examined it, and said he thought it was good. He then gave the note to Boyd and received small notes for it. Some weeks afterwards, Boyd sent a message to Shelor that the note had been disputed in Baltimore. He took it to four banks; the first three would net receive or condemn it. but it was pronounced counterfeit by the fourth. Shelor came up and said, T will take it back.’ Boyd said, ‘any time within two or three weeks will do.’ Shelor . said, that was more time than he wanted. A short time thereafter, on the 17th day of [ May, Shelor came to Boyd’s store and called him out for a private conversation, in which he told Boyd he was going to Lynchburg with his tobacco next week, and he wanted to take the note and have it examined, and did not have' the money, but would give his due bill for it. and when he came back from Lynchburg would bring the money. Boyd declined to give up the note in exchange for the clue bill. Shelor started away; but immediately becoming very angry, returned and said, Y have asked you to take my due bill; you refuse to credit me; you must think I am insolvent; but (with an oath here omitted) I can buy you and the whole Scott family. You took the note on your own responsibility; now (oath used omitted) crack your whip.’ ” The foregoing evidence is from the bill of exceptions. _
_ In this connection, it is stated in the bill that “the -plaintiff assigned_ as a reason for becoming angry that it occurred to him, as he started off, that Boyd intended to prosecute him and do what he has done;” that “considerable abuse was then used by Shelor towards Boyd and Scott.” The facts and circumstances established by this evidence, together with the fact that Shelor resided in the same county with the defendants, had been long well-known to ttem and admitted by Scott to have been a man of reputed hcinesty, were all the facts and circumstances shown by such of the evidence as can be considered by this court, within the knowledge of the defendants, affecting the question of probable cause for the prosecution. It would be a waste of time to argue to show that they fall far short of proof of probable cause. No man of ordinary caution and prudence would be warranted in the conclusion of guilt based upon upon such facts and circumstances. They would indeed seem scarcely sufficient to raise a slight suspicion. Nor would it help Üie defendants if in deciding this cause we were to take into consideration all the facts and circumstances proved by the evidence, or which the evidence tends to prove, touching the question of probable cause, supposing they had all come to the knowledge of the defendants before the prosecution was commenced.
Shelor acquired the treasury note in 1872 from some persons in Franklin county, as part of the purchase money for land sold to them. In February 1873 he gave it to W. II. Frances, his son-in-law and partner in business, to be used in purchase of goods in Baltimore. It was passed by Frances to some merchants in Baltimore in payment for goods. The merchants returned the note to Frances “as doubted, but they would not condemn it.” It was then examined by two merchants in Christiansburg, good judges of *money, one of whom had been a teller in a bank, and they pronounced the note genuine. Afterwards, Shelor offered to pass it to a saddler at Franklin Court-house in the purchase of a saddle; and a question being raised about its genuineness. it was submitted to the examination of Greer, the cashier of a bank at Franklin Court-house, who pronounced it good. When Shelor passed the note to Boyd, he told him the note had been disputed, but did not tell him where or when it had been disputed. Scott had information at the time he wrote the letter to the revenue officer that Shelor had offered to pass the note at Franklin Court-house, but he did not regard the information as reliable. Now all these facts, treating them as proved, and’ assuming, contrary to the fact, that they were in the knowledge of the defendants when they commenced the prosecution, did not of themselves, nor in connection with what was actually known to the defendants, furnish anv reasonable ground of suspicion against Shelor. A prosecution based upon such facts would be a prosecution without probable cause.
Fourth. Was the prosecution malicious?
To maintain his action, the plaintiff must not only prove want of probable cause, but malice also. The two must concur. Both must be proved. Malice may be inferred from the want of probable cause, but the latter can never be inferred from even the plainest malice. _ In a legal sense, any unlawful act which is done willfully and purposely, to the injury of another, is as against that person malicious. 1 Hillard on Torts, ch. 16, § 24. The improper motive, or want of proper motive, inferrable from a wrongful act, based on no reasonable ground, constitutes of itself all the malice deemed assential in law to the maintenance of *284 *the action for malicious prosecution. Spengler v. Davy, 15 Gratt. 381.
It is impossible to read the evidence in this, case without coming to the conclusion that the motive for the prosecution sprang from the abusive language used by Shelor on the 17th of May. Moved by resentment, engendered 'by this language, Scott wrote the letter to the revenue officer the next day. Indeed, it was proved that Boyd admitted “that he would not have set the prosecution on foot if Shelor had not abused the Scott family;” and he was heard further to say, after the prosecution commenced, “that he did not believe Colonel Shelor knew the note was counterfeit when he passed it.” Again, when Boyd testified before commissioner Walsh, on the examination of the plaintiff, touching the felony with which he was charged, he represented Shelor as having said to him on the 17th day of May that he (Shelor) knew that the note was counterfeit when he let him (Boyd) have it. And yet the language employed by Shelor, on the 17th of May, as proved on the trial of this case, contains no such admission as Boyd imputed to iShelor on the examination before the commissioner. From this evidence, and from other circumstances proved in the case, it is manifest that the prosecution proceeded from a desire and purpose on the part of the defendants to injure the plaintiff, and was therefore malicious.
Upon the whole matter, I conclude that the plaintiff proved his case, and was entitled to a verdict. He was maliciously, and without probable cause, arrested and prosecuted on a false charge of felony. He was taken from his home and his family, carried to a distant place, and there tried by a jury of strangers; in *the course of the trial was imprisoned; and besides the ignominy and annoyance to which he was subjected, it was proved that he incurred costs to the amount of six hundred dollars in defence of the prosecution. A special jury, selected under the law, assessed his damages at $1,000. The learned judge who presided at the trial found no fault with the verdict, nor do I find any.
I am therefore of opinion to affirm the judgment of the circuit court with damages.
Judgment affirmed.