Syllabus.

## Richmond.

## SOUTHERN RAILWAY COMPANY V. MOSBY.

### March 9, 1911.

1. MALICIOUS PROSECUTION—*Malice.*—In an action for malicious prosecution malice may be implied from the want of probable cause if the circumstances will warrant the implication, but the existence of malice may be repelled by the circumstances, though there was not good ground for the prosecution, and in such cases the action will not lie.

2. MALICIOUS PROSECUTION—*Probable Cause—How Determined—Evidence of Accomplice.*—In an action for malicious prosecution, want of probable cause must be determined by the facts known to the defendant and which influenced him in instituting the alleged malicious proceeding, and not by the facts developing on the trial. The facts and circumstances evidencing probable cause are to be viewed from the standpoint of the defendant, and not that of the plaintiff. Information received from one admitting his participation in a crime is sufficient to create probable cause for prosecution, if there is no reason to doubt its truth, although it may be subsequently shown at the trial that he was unworthy of belief.

3. MALICIOUS PROSECUTION—*Probable Cause—Evidence of Good Character of Plaintiff—Case at Bar.*—In an action for malicious prosecution, the fact that the defendant set on foot the prosecution upon information derived from an alleged accomplice and the evidence of another party as to suspicious circumstances connecting the plaintiff with the crime of larceny charged, and that he had no reason at the time to doubt their statements, and that upon the evidence of these two witnesses the plaintiff was sent to the grand jury, and was indicted by two separate grand juries for the offense alleged, constitutes *prima facie* evidence of probable cause to believe the plaintiff guilty, although he was subsequently acquitted on both indictments; and this evidence of probable cause is not overcome by proof of the fact that, up to the time of his arrest, the plaintiff uniformly bore a good reputation for honesty and integrity, and the defendant knew of such reputation.

4. MALICIOUS PROSECUTION—*Probable Cause—Plaintiff's Good Character.*—While a man's good character is not to be lightly put

22

in jeopardy, yet, in the interest of good order and the uphold-
ing and enforcement of good citizenship, prosecutors of wrong-
doers are not to be deterred from doing their duty to the public
by the fear of being mulcted in heavy damages because of
honest mistakes made in instituting criminal proceedings. If
the prosecutor has acted in good faith in setting on foot a
criminal prosecution, and had reasonable and probable cause
to believe the accused to be guilty, no action can be main-
tained against him though the accused was in fact innocent.

Error to a judgment of the Law and Equity Court of the
city of Richmond, in an action of trespass on the case.
Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Munford, Hunton, Williams* and *Anderson,* for the plain-
tiff in error.

*L. O. Wendenburg,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

On the 24th day of July, 1908, J. N. Seagle sued out a
warrant in the city of Richmond, charging that Joseph L.
Mosby, of said city, within thirty days last past, "did un-
lawfully and feloniously steal, take and carry away one case
of Piedmont cigarettes of the value of $85.00 in U. S.
currency, the property of the Southern Railway Co." Upon
this warrant Mosby was arrested, carried before the police
justice of the city, and there, after a preliminary hearing,
was sent on to the grand jury. In October, 1908, the grand
jury of the hustings court found an indictment against
Mosby, containing three counts; the first count charging
him with stealing a case of cigarettes on June 2, 1908, the
second with stealing a case of cigarettes on the......day
of February, 1908, and the third with stealing a case of
cigarettes within twelve months last past.

On the 18th day of May, 1909, when the accused, Mosby, was put upon his trial on his plea of not guilty, the court, upon motion, required the attorney for the Commonwealth to elect on which count in the indictment the trial should proceed, and for some reason, not shown, the attorney selected the count charging Mosby with the theft of a case of cigarettes on June 2, 1908, although Seagle had suggested to him that the accused be tried for stealing the case of cigarettes on July 6, 1908, the charge upon which Seagle had in fact sworn out the warrant which originated the prosecution.

The trial on May 18, 1909, resulted in a verdict of not guilty as charged in the first count of the indictment, the second and third counts having been quashed.

The attorney for the Commonwealth, having then full knowledge of all the testimony, on June 7, 1909, again had Mosby indicted for the July, 1908, offense, but upon his trial in November, 1909, he was also acquitted. Thereupon, Mosby instituted this suit against the Southern Railway Company for malicious prosecution, and upon the trial thereof the jury found a verdict in favor of the plaintiff for $6,600, and judgment was entered thereon, which judgment is before us upon a writ of error awarded the defendant company.

The first two assignments of error having been practically waived in the argument here, we need only consider the third and last assignment, which relates to the ruling of the trial court in refusing to set aside the verdict of the jury because contrary to the law and the evidence.

The facts of the case are as follows: Seagle was a special agent of plaintiff in error, and during the winter of 1907 and spring of 1908 had a number of claims against the railroad referred to him for tracing which appeared to be lost shipments. One of these claims was for cases of Piedmont cigarettes, and upon investigation it was found

that these shipments "checked short under Richmond seals," so as to indicate that the shipments had never been put in the car, and that the trouble arose before the car left Richmond, there being some twelve or fifteen of such lost cases, of which some amounted in value to $87.50 and others $91.00. The manufacturer and shipper of these cigarettes was the American Tobacco Company, which made the claims against the Southern Railway Company, which the latter had referred to Seagle, its special agent. Seagle examined the records of the railway company and found bills of lading had been signed and receipts given for these various shipments; then he went to the American Tobacco Company to investigate, where he found that each missing case had been handled by a different driver, so that there was no reason to suspect the drivers of the American Tobacco Company. During this investigation Seagle was told by one Moseley, an employee of the American Tobacco Company, that he (Moseley) had heard of a great many claims for lost cases of cigarettes being filed, and that he (Moseley) knew a party who had seen a case marked to the Merchants Grocery Company, Gaffney, S. C., in Jerry Morano's place in Richmond. Seagle at that time had at his office papers relating to the claim of this grocery company for the lost case of Piedmont cigarettes, but Moseley was unwilling to give him the name of the party who would give him the information about the case at Morano's place, but later Seagle learned that a Mr. Patrick, connected with the firm of E. A. Saunders & Son, had given Moseley the information. Seagle then talked with Patrick, and thereupon took Smith, one of the clerks of the railway company with him to Morano's place and questioned Morano, and Morano told him that he had been getting these cigarettes for about a year from a man named Duke, who had been a magistrate and was known as "Squire" Duke, and who was tending bar for a man named Doherty. Seagle and Smith then went

to see Duke, and Duke confessed, saying that he had been getting the cigarettes from a negro named Ernest Morris, who was not employed by the railway company, and he (Duke) admitted that he had supplied Morano with probably five cases of cigarettes, and asked what it would take to shut the matter up, but declined to tell what employee at the railway station he had been dealing with, and would only say that it was not a negro but a white man.   While Seagle and Smith were talking with Duke, J. F. Wiley, a bicycle policeman of the city, came in, and Seagle left Duke with Wiley, while he (Seagle) went and procured a warrant for Morris, and after getting this warrant Seagle was advised by Wiley over the 'phone that Duke was gone, and thereupon a warrant for Duke was also obtained.   Duke was arrested by Wiley and bailed, but subsequently forfeited his bail.   The day after Duke was arrested Seagle and Wiley went to Doherty's place, where Mrs. Doherty showed them a note from the negro, Ernest Morris, to her husband, which she gave to Seagle, in which note Morris referred to Duke's having run off, and threatened that if Doherty did not send him (Morris) "money to get out of town, if I am caught I am going to tell on all of you  . . ."   Morris, on July 24, 1908, several days after the warrants for him and Duke had been issued, gave himself up, and Seagle and Wiley went to see him and showed him the said note he had written to Doherty, whereupon Morris said that he would tell the whole story, and proceeded to make a statement. the substance of which was that Duke, Doherty, Morano and himself were implicated in the matter, and one Meredith knew something about it;   that a white man employed by the railway company was also connected with the stealing of the cases of cigarettes, and described him and said that he worked at Nos. 8, 9 and 10 doors of the freight receiving shed of the Southern Railway;   that Duke had induced him (Morris) to get the ciga-

rettes, and he went down one evening and saw how easy it was to get them; that afterwards Duke gave him (Morris) ten dollars and told him to get the cigarettes, and if anybody said anything to give him the ten dollars; that the first time he got the cigarettes no one said anything to him, but the second time the man described asked him what he was going to do with the case of cigarettes, to which he (Morris) replied that he was going to ship them; whereupon Mosby (defendant in error) asked him where was his bill of lading and he gave him (Mosby) ten dollars and took the case of cigarettes; that he never had any particular conversation with Mosby after this, but continued to get cases of cigarettes, and at different times handed Mosby five or ten dollars, to an aggregate of between twenty-five and thirty-five dollars, all of which had been furnished by Duke; and Morris claimed that it was impossible for him to be mistaken in the man of whom he was speaking. Seagle and Wiley then took Morris to the Southern Railway shed to identify and point out the man, taking with them a justice of the peace, Purdie, so that a warrant might issue if necessary. Seagle went to the shed ahead of the others, and in a short while Wiley, Morris and Purdie came in and thereupon Morris promptly identified Mosby as the man from whom he had gotten the cigarettes and to whom he paid the money, saying that he could not be mistaken, and that there was no use for him to look at any one else. There was then some talk between Seagle and Mosby, as to the details of which there is a difference of recollection, and they all then went into a small office in the receiving shed, where Purdie at the request of Seagle prepared and issued a warrant for Mosby's arrest. Mosby protested his innocence, claiming that he had "never seen the negro before in his life," but Morris faced him, saying, "You know you are guilty same as I am."

Prior to the issuing of the warrant on July 24, 1908,

under which Mosby was arrested, charged with the larceny of a case of cigarettes within thirty days prior thereto, Seagle had examined the records of the railway company and ascertained that every clerk in the receiving sheds had signed bills of lading for a missing case of cigarettes except Mosby; and while the arrests of Duke and others were being made, Seagle found at Morano's place a part of the top of a case of cigarettes which had been stolen July 7, 1908, shipping No. 5969, consigned to Merchants Grocery Co., Gaffney, S. C.; Morris having told Seagle that he would find that box top at Morano's.

A. L. Tyler, a special officer of the Southern Railway Company, had on a certain occasion told Mosby that he was going home to rest, and Mosby had told him that he (Mosby) thought it would be a good idea to come down there early in the morning and late in the evening to watch the shed, and instead of then going home to rest Tyler went to the passenger station and came around the rear of the cars and into the shed twenty to forty minutes after his interview with Mosby. When he got in there he saw a box being carried out of this receiving shed at door 9, without any paper or bill of lading passing between Mosby and the driver; the rule being that if a box had been received in error and was being returned to a driver he should deliver up the bill of lading which had been issued therefor. When Tyler went over to Mosby and Mosby saw him, Mosby turned and said in a quick and impatient way to the man at the wagon, "Go ahead," and motioned to him to go ahead. Whereupon Tyler asked Mosby where the box was going, to which Mosby replied, to the Coast Line; and while Tyler at the time accepted Mosby's statement, the more he thought about it the less he was satisfied, and his suspicions became aroused and he brought the matter to Seagle's attention a number of times, but no impression was made thereby on Seagle at that time, as he had a high opinion of Mosby.

In the preliminary hearing given Mosby in the police court, Tyler testified that the occurrence just related was about the first or sixth of June, 1908, but might have been earlier or might have been later. Subsequently he concluded that it was the 6th of July, 1908, giving his reasons therefor.

There is some evidence to show that the box of which Tyler was speaking was a box of books from Richmond College, but there is no testimony that Seagle ever heard this prior to the swearing out of the warrant against Mosby.

What followed the sending on of Mosby to the grand jury by the police justice we have related, and we have set out, perhaps at greater length than was necessary, the facts and circumstances which led to his arrest on the warrant of July 24, 1908, in order to show that it is idle to talk about that prosecution having been set on foot recklessly or without investigation of the facts and circumstances pointing to defendant in error's participation in the theft of the lost cases of cigarettes.

We need not refer to the authorities as to when malice may be inferred from the want of probable cause, since the instructions in this case, as is conceded, correctly propounded the law to the jury on that subject; and the inquiry as to whether there was want of probable cause to believe in the guilt of Mosby is narrowed by Instruction No. 8, given by the trial court and not contested, which told the jury that if Seagle believed the statement of Morris and swore out the warrant, and that thereupon Mosby appeared before the police justice, who upon an examination of witnesses sent Mosby on to the grand jury, and the grand jury, upon the hearing of witnesses, "found true bill of indictments for said offense as charged, the same is *prima facie* evidence of probable cause, and unless rebutted by the plaintiff the jury must find for the defendant, notwithstanding the subsequent acquittal of the plaintiff."

That the police justice, after examining witnesses, sent defendant in error on to the grand jury; and that he was by a grand jury indicted in October, 1908, and again in June, 1909, was tried upon these indictments and acquitted, are undisputed facts; and, therefore, the question upon which the decision of the case here must turn is whether or not the defendant in error has successfully carried the burden which the law, as propounded by the instructions of the trial court, imposed upon him. The court further told the jury, and rightly, that the question of the guilt or innocence of the defendant in error was not an issue before them, and that information received from an accomplice is sufficient to create probable cause, if there is no reason to doubt its truth.

The accomplice, Morris, made a complete and full confession and statement to Seagle, to the effect that there was a regular gang engaged in stealing cases of cigarettes from the station of the Southern Railway Company; that a man whom he described and afterwards identified as defendant in error was the man at the station connected with the railway who permitted him (Morris) to get cases of cigarettes, and to whom he (Morris) paid at various times twenty-five to thirty-five dollars, which Duke had given him to pay defendant in error for letting him get the cigarettes. Morris had also told Seagle where he could, and where Seagle did, find a part of the top of a box of one of these cases of cigarettes, and instead of there being contradiction of these statements made by Seagle, as to what Morris told when confessing his connection with the systematic stealing of cigarette cases, they are ·fully confirmed by Wiley, the bicycle policeman, who was present and heard Morris' statement.

Now it turned out at the trial of defendant in error upon the first indictment found against him, that Tyler, who had also been an informant of Seagle as to suspi-

cious circumstances involving defendant in error, had a very treacherous memory; and that Morris was a notorious thief and wholly unworthy of belief. Upon these circumstances, and the assumption that the story told Seagle by Morris as to giving defendant in error money at various times when cigarettes were taken from plaintiff in error's sheds, was so improbable, it is argued, that Seagle should have known that there was no truth in the statements of Morris. And the conduct of defendant in error when apprised of the suspicions against him is also emphasized 'n argument on his behalf here; but when scanned it does not appear that his conduct amounted to such a disavowal of guilt as should "have cooled the zeal of Seagle." What defendant in error said, in substance, is in these declarations of his: "You want the wrong man. I am firmly convinced beyond reasonable doubt you are after the wrong man, and, this being the case I will come into the office with you." And after he got into the office and the warrant had been asked for, he said, among other things: "Mr. Seagle, this is a monstrous affair; you are treating me wrong, and take time and consider this matter. You are entirely wrong."

Taking these sayings of the defendant in error and considering them in connection with information Seagle then had, we cannot agree that they were so convincing of defendant in error's innocence that a reasonably prudent man should have desisted in his purpose to have him arrested as a participant in a regular and systematic stealing of cigarettes from the station of a railway company.

The defendant in error stands twice acquitted by a jury of his countrymen of the charges preferred against him, and with the reasons of those juries for concluding that he was not guilty we are not concerned; but it will not do to say that because Tyler proved to have a very treacherous memory, or was even unworthy of belief at the trials of

defendant in error, and Morris was shown to be a common thief and wholly unworthy of belief, the jury in this case were warranted in the conclusion that the instigators of the prosecution of the defendant in error were doing a wrongful act with an improper motive, and were, therefore, guilty of malice in law; and especially is this true upon this record, in which there is not the slightest proof that Seagle knew before instigating the prosecution that Tyler would prove to be an indifferent witness, and that Morris would show up so badly that a jury could not give any sort of credit to his statements. Certain it is that the police justice and two grand juries who found true bills of indictment against defendant in error gave credence to the evidence of both Tyler and Morris, as Seagle had done.

In *Womack* v. *Circle*, 32 Gratt. 332, the opinion by Anderson, J., after stating that, "Malice may be implied from want of probable cause; but not necessarily. In the celebrated cause of *Johnstone* v. *Sutton*, 1 Durn. & East, p. 544, Lord Mansfield and Lord Loughborough said: 'From the want of probable cause malice may be, and most commonly is, implied. But that must be shown by the plaintiff';" quotes as follows: "In *Herman* v. *Brookenhoff*, 8 Watts (Pa.) 240, Chief Justice Gibson said, 'In a criminal prosecution want of probable cause muse be combined with malice.' Again he says, 'want of probable cause is evidence of malice, though inconclusive in the origination of a prosecution.' Cases may be readily conceived, where the prosecution was instituted upon grounds of suspicion which would not amount to probable cause, where there was an entire absence of ill-will or malice on the part of the prosecutor. In such cases the action will not lie, because there must be combined malice and want of probable cause shown. And combined malice may be implied from the want of probable cause if the circumstances will warrant the implication, yet the existence of malice may be repelled

by the circumstances, though there was not good ground for the prosecution; and in such cases the action will not lie. This doctrine is clearly stated and supported by authorities in Bigelow's L. C. on the Law of Torts, p. 178 to 181."

"In an action for malicious prosecution, want of probable cause must be determined by the facts known to the defendant and which influenced him in instituting the alleged malicious proceeding, and not by facts developing on the trial." *Scott* v. *Shelor,* 28 Gratt. 891.

In an instructive opinion in the case of *Porter* v. *Mack,* 50 W. Va. 581, 40 S. E. 459, it was held, that "On the question of probable cause in an action for malicious prosecution, the facts and circumstances, knowledge and information, must be viewed from the standpoint of the defendants and not that of the plaintiff; and if they, in good faith, being men of ordinary prudence, entertained the reasonable belief that it was their duty to institute and maintain the proceedings complained of, they cannot be held liable therefor." In that case it is further said that where the defendants in an action for malicious prosecution, being men of ordinary prudence, believed in good faith from their own knowledge and understanding of the facts and circumstances, or from information received from reliable sources, that the judicial proceedings instituted by them were necessary and justifiable, they cannot be held liable, although it shall afterwards be made to appear in a suit for that purpose by a preponderance of the evidence that such proceedings were without just foundation.

As we have seen, there is no ground upon which it could be fairly concluded that Seagle knew that the sources from which he got his information were not reliable before he instituted this prosecution, and we have further seen that the authorities maintain, and as the court in this case instructed the jury, that information received from one ad-

mitting his participation in a crime is sufficient to create probable cause for prosecution, if there is no reason to doubt its truth. Now, with reference to the information obtained by Seagle from Morris, there was no reason why the information should not have been credited, especially when considered in the light of other circumstances and other facts which had come to the knowledge of Seagle.

The trial court rightly told the jury that if they found that defendant in error, up to the time of his arrest, uniformly bore a good reputation for honesty and integrity, and that if plaintiff in error knew his reputation to be such up to the time of his arrest, then that fact was a proper one to be considered by the jury, in connection with all the other evidence in the case, in determining whether or not plaintiff in error had probable cause to believe, and did believe, in good faith, that the defendant in error was guilty of the crime charged against him; but we fail to find in the record evidence sufficient to rebut the *prima facie* evidence of probable cause consisting of the undisputed facts, that after examining the witnesses the police justice sent the defendant in error on to the grand jury, and that the grand jury found true bills (two) of indictment against him, although he was afterwards acquitted of both. Instead of carrying the burden upon him throughout the trial of this case of showing combined malice and want of probable cause for the arrest of defendant in error, the evidence, viewed as upon a demurrer thereto, discloses such a state of facts as refutes the existence of malice or ill-will on the part of Seagle, and amply shows that Seagle, as the agent of plaintiff in error, procured the arrest in an honest belief of the guilt of the accused, a belief shared in by the police justice and two grand juries.

Much is said, *arguendo,* in cases like this about character being put lightly in jeopardy, and the law fully upholds that theory, but it is to be borne in mind that in the in-

terest of good order and society, and the upholding and enforcement of good citizenship, prosecutors of wrongdoers are not to be deterred from doing their duty to the public by the fear of being mulcted in heavy damages because of honest mistakes made in instituting criminal prosecutions. Public carriers of freight are held to be insurers of goods committed to them for shipment, and if they were lightly to be mulcted in damages in every case in which an attempt to punish and thereby stop theft fails, an intolerable burden would be added to those they are rightly called upon to bear.

It would seem hard, it is true, that a man may be prosecuted for a supposed crime, and yet have no redress against the prosecutor, and yet this must frequently be so, for the preservation of the peace and good order of society requires that even the innocent may be compelled to submit to such inconveniences and hardships rather than that citizens should be deterred from instituting prosecutions where there is reasonable or probable cause to believe the accused guilty. Good faith on the part of the prosecutor is always an important if not a vital element of inquiry, and is always a sufficient justification, except where an unreasonable credulity is manifested in inducing the prosecutor to draw conclusions of guilt which persons of ordinary prudence and judgment would not have drawn. Newell on Mal. Pros. 269.

In this case we are of opinion that the prosecution complained of was instituted in good faith and for probable cause, that the verdict of the jury complained of is without sufficient evidence to sustain it, and the judgment thereon will be reversed, the verdict set aside and the cause remanded.

*Reversed.*