**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 10-2242

CLYDE L. BENNETT,

                    Plaintiff - Appellee,

          v.

R&L CARRIERS SHARED SERVICES, LLC; DAVID JOHN MCGINNIS, SR.,

                    Defendants - Appellants,

          and

R  L  CARRIERS,  INCORPORATED,  a/k/a  R&L  Carriers,
Incorporated,  a/k/a  R  L  Carriers,  a/k/a  R&L  Carriers;
FRANKLIN FINLEY; JAY BULLARD; DAVID LOWRY; GREENWOOD MOTOR
LINES, INCORPORATED,

                    Defendants.


Appeal  from  the  United  States  District  Court  for  the  Eastern
District  of  Virginia,  at  Richmond.    Robert  E.  Payne,  Senior
District Judge.  (3:08-cv-00498-REP)


Argued:  January 26, 2012            Decided:  June 21, 2012


Before AGEE, DAVIS, and FLOYD, Circuit Judges.


Affirmed  by  unpublished  opinion.    Judge  Davis  wrote  the  majority
opinion,  in  which  Judge  Floyd  joined.  Judge  Agee  wrote  a
dissenting opinion.

**ARGUED:** Daniel A. Pollack, MCCARTER & ENGLISH, LLP, New York, New York, for Appellants. John Barry Donohue, Jr., THE LAW OFFICE OF JOHN BARRY DONOHUE, JR., Richmond, Virginia, for Appellee. **ON BRIEF:** Frank E. Ferruggia, Edward T. McDermott, Steven A. Beckelman, Laura Leacy Kyler, MCCARTER & ENGLISH, LLP, New York, New York, for Appellants. James B. Thorsen, MARCHANT, THORSEN, HONEY, BALDWIN & MEYER, LLP, Richmond, Virginia, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Circuit Judge:

After a three-day trial in the Eastern District of Virginia, a jury found Appellants R&L Carriers Shared Services, LLC (R&L), and David J. McGinnis, Sr., liable to, and returned a substantial damages verdict in favor of, Appellee Clyde Bennett on Bennett's claim for malicious prosecution. Bennett, a former employee of R&L, had been arrested and indicted on a charge of embezzlement based on Appellants' allegations that he had stolen three computers from the workplace, a trucking terminal.

Bennett's claim arose under Virginia law, pursuant to which, "[i]n an action for malicious prosecution, the plaintiff has the burden of proving four essential elements: that the prosecution was (1) malicious, (2) instituted by or with the cooperation of the defendant, (3) without probable cause, and (4) terminated in a manner not unfavorable to the plaintiff." Reilly v. Shepard, 643 S.E.2d 216, 218 (Va. 2007). Appellants contend before us that the evidence at trial was insufficient as a matter of law to support the jury's verdict as to elements (1), (3), and (4). They contend, in the alternative, that the amount of the verdict ($1,716,920 in compensatory damages and a total, as remitted, of $350,000 in punitive damages) is so excessive as to require, at a minimum, a new trial on damages.

The district court rejected Appellants' contentions as to the sufficiency of the evidence at the close of plaintiff's case

3

and again, in a meticulously-reasoned and comprehensive opinion, see Bennett v. R & L Carriers Shared Servs., LLC, 744 F. Supp. 2d 494 (E.D. Va. 2010), when they were renewed in a post-verdict motion under Fed. R. Civ. P. 50(b). The district court remitted the original punitive damages claim (as required by Virginia law), but otherwise it also rejected Appellants' motion for a new trial under Fed. R. Civ. P. 59. We have carefully considered Appellants' contentions and discern no reversible error. Accordingly, we affirm the judgment.

## I.

We first consider Appellants' contention that the district court erred in submitting this case to the jury, in light of what they argue was insufficient evidence to support elements of Bennett's claim. We then examine Appellants' contention that the jury's damages award (as remitted) exceeds the bounds of propriety.

Our approach to appellate challenges to a jury verdict and a district court's concomitant denial of a motion for judgment is well-settled:

> We review de novo a district court's denial of a Rule 50 motion for judgment as a matter of law. Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543 (4th Cir. 2003). Pursuant to Rule 50, the issue for assessment on appeal is whether there was a legally sufficient evidentiary basis for a reasonable jury, viewing the evidence in the light most favorable to

4

the prevailing party, to find for that party. Fed. R. Civ. P. 50(a); Bryant, 333 F.3d at 543. If reasonable minds could differ about the verdict, we are obliged to affirm. [Id.] As with other legal rulings, we review de novo the conclusions of law on which a trial court's denial of judgment as a matter of law is premised. See Benner v. Nationwide Mut. Ins. Co., 93 F.3d 1228, 1233 (4th Cir. 1996). And we are obliged to accord substantial deference to a district court's interpretation of its own judgment. See Home Port Rentals, Inc. v. Ruben, 957 F.2d 126, 131 (4th Cir. 1992).

ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 472 F.3d 99, 113 (4th Cir. 2006). Guided by these principles, and according "substantial deference," id., as we must, to the district court's searching interpretation of the record supporting the judgment, we are constrained to reject Appellants' contentions. In rejecting Appellants' contentions, we fully embrace, and quote extensively, the comprehensive opinion of the district court.

A.

Based on all the evidence admitted at trial, and drawing all reasonable inferences in favor of Bennett as the prevailing party, the jury was entitled to make the following findings.

R&L Carriers is a national shipping company that, among other services, manages and completes shipments of various goods at trucking terminals throughout the country. As of March 2006, Bennett, who was fifty-years-old, had been employed for more than two years by R&L as a night shift supervisor at the

5

Colonial Heights, Virginia, terminal, located outside of Richmond (the Richmond terminal). Bennett was responsible for overseeing the proper loading and unloading of shipments into and out of tractor trailers and other vehicles by dockworkers.

On Friday, March 3, 2006, R&L discovered that thirteen laptop computers had gone missing while passing through the Richmond terminal en route to their final delivery in Miami, Florida. Two dockworkers, Conan Spangler and Joseph Mitchell, had handled the transfer of the laptop shipment from one tractor trailer to another; inexplicably, they completed conflicting records as to whether the laptops were on the inbound and outbound trucks. Specifically, Spangler recorded the laptops as not received on the inbound tractor trailer from Newark, New Jersey, while Mitchell, essentially working alongside Spangler, recorded the laptops as safely loaded on the sealed outbound tractor trailer. When the tractor trailer was unsealed in Jacksonville, Florida, the laptops were not onboard.

A couple of weeks later, on March 17, 2006, another theft occurred from the dock at the Richmond terminal. Six (of a total of 96) Hewlett Packard computer towers that had been delivered locally were returned to the terminal because their packaging had been damaged and, although they were functionally sound, the computers were rejected by the consignee. The towers were placed in the "Over, Short, and Damaged" (OS&D) area of the dock. This

6

was "an open area delineated by stanchions and rope." J.A. 668. By Sunday, March 19, 2006, two days after being placed there, three of the six towers were missing from OS&D. (As explained infra, Appellants' procured Bennett's arrest and indictment based on their contention that Bennett stole the three computer towers.)

Faced with two apparent thefts within two weeks, the manager of the Richmond terminal, Franklin Finley, contacted R&L's director of operations for the southeast United States, Jay Bullard, and informed him that the company was "missing some computers." J.A. 668. Bullard directed Finley to confirm that the computers could not be accounted for anywhere on the delivery line, and once Finley did so Bullard contacted R&L's regional security investigator, Appellant McGinnis. McGinnis had retired in or about 2002 as a police officer after a 21 year career with the Atlanta, Georgia, police department. Following his retirement, he had joined R&L as a truck driver. After working as a driver for two years, in light of his extensive law enforcement background and his investigative experience, he was named regional security investigator when the R&L security division expanded.

McGinnis arrived at the terminal from Atlanta on Monday, March 27, 2006, aware only of the first theft, i.e., the theft of the thirteen laptops. His review of the shipping documents

7

related to the laptops confirmed that they had been on the truck inbound to Richmond and were missing after the shipment was supposed to be transferred from one truck to another by Spangler and Mitchell. Understandably, McGinnis's suspicions immediately focused on "those two individuals right there [i.e., Spangler and Mitchell]." J.A. 318. McGinnis asked Bullard and Finley "who they considered to be prime suspects," J.A. 778, and the men identified dockworkers Spangler, Mitchell, and David Lowrey "because of their computer knowledge and activities and the fact that two of the individuals had direct contact with . . . the missing shipments."[1] J.A. 778. It is unclear exactly when

---

[1] In one of several telling aspects of these proceedings, McGinnis prepared an investigative report for R&L in April 2006, upon his return to his Atlanta office. The investigative report was introduced at trial and thus amounted to substantive evidence, i.e., a series of admissions, by Appellants. Remarkably, several statements made by McGinnis in the investigative report deviated from, and indeed, contradicted, McGinnis's trial testimony.

One of the most striking contradictions related to the identity of those persons having "a lot of computer knowledge." Although McGinnis testified at trial that he had asked only for the names of people who Bullard and Finley "might suspect. . . that [have] a lot of computer knowledge," J.A. 320, his investigative report indicates that he asked only about who the men "considered to be prime suspects." J.A. 778. In any event, the record shows that despite McGinnis's testimony on direct examination that Spangler, Lowrey and Bennett were named initially, his own investigative report identified Spangler, Mitchell and Lowrey (not Bennett). Plainly, as the district court observed, the jury was entitled to credit the investigative report rather than McGinnis's trial testimony.

McGinnis became aware of the missing computer towers, i.e., the second incident of workplace theft, but after his arrival in Richmond he was soon so.[2] As with the laptops, McGinnis confirmed that the towers had in fact arrived at the terminal before their disappearance.

McGinnis then began to interview employees. First, he interviewed Lowrey, for "no more than ten minutes," about the missing computers. J.A. 323. Lowrey said he did not know where the computers were or who might have taken them. McGinnis encouraged him to come forward with any information and informed him that R&L's "silent witness" program provided rewards for tips that lead to arrests and convictions for employee theft.[3]

McGinnis also interviewed Bennett, who similarly denied any knowledge of where the missing computers were or who might have taken them. McGinnis did not believe that Bennett was being forthcoming in this interview based on his assessment of

---

[2] Understandably, during the trial the district judge urged defendants' counsel to maintain clarity as to whether particular testimony was being offered about the laptop computer theft or the desktop computer tower theft. Counsel for R&L explained that testimony about the laptops was important because at the preliminary stage of the investigation, McGinnis "had no idea whether the same people were involved in the 13 as the three." J.A. 331.

[3] McGinnis's investigative report indicates that Lowrey "was questioned more intensely" than the others "because of his reported computer knowledge." J.A. 779.

9

Bennett's "mannerisms." J.A. 324. He asserted that, "I could not make eye contact with him. It was like he was just a robot. Just his answers were just, I don't know, I just had a bad feeling that he wasn't tell me everything that he knew." J.A. 324-25.

At some point during this first day of investigation, McGinnis also interviewed Mitchell, one of the dockworkers who completed conflicting records about the transfer of the thirteen laptops from one trailer to another. Mitchell claimed to have simply made a mistake on the paperwork and offered no further explanation or information. McGinnis's investigative report recorded that, "Of all the employees questioned that evening, all denied any involvement. However, the mannerisms of Mitchell, Lowrey, and Bennett left me with a feeling that they were not being truthful." J.A. 779-80.

The next day, Tuesday, McGinnis interviewed Spangler, who had worked with Mitchell handling the laptop shipment and whose paperwork contradicted his. Spangler was "real, real evasive" and "real arrogant" when questioned about the paperwork, and claimed no knowledge of where the laptops or the towers might be. J.A. 327-28. That evening McGinnis questioned Spangler again, becoming "more intense" about the discrepancies between his records and Mitchell's records for the laptops. J.A. 330. Ultimately, during this "intense" interrogation, McGinnis told Spangler, "I feel like you and Mr. Mitchell took those laptops .

10

. . . I can't prove it, but I am going to stay here until I can, because they went somewhere." J.A. 332. McGinnis's report noted that Spangler was "definitely deceptive," and that:

> Based on Spangler's demeanor, I advised him that I felt he WAS involved, and further, I intended to pursue the matter until I could prove his involvement and have him arrested and placed in jail. I then advised him that when that happened, he would most certainly ask for consideration from me, which I would NOT offer him.

J.A. 780 (emphases in original).

After this second interrogation of Spangler, McGinnis received a call from Spangler's wife. Spangler's wife told McGinnis that Spangler had come home and stated he was possibly going to jail for stealing the three tower computers but she said nothing about the thirteen laptops that McGinnis had actually questioned Spangler about earlier that day. Further, Mrs. Spangler told McGinnis that, according to her husband, Spangler did not steal the tower computers but he knew that Bennett and Lowrey did steal them.[4] McGinnis told Mrs. Spangler to call her husband, who was then at work at the terminal, and instruct him to leave under the pretense of a family emergency and meet McGinnis at a nearby truck stop.

---

[4] In an extended exchange with the court, Appellants' counsel agreed that Mrs. Spangler's statements to McGinnis could not be treated by the jury as substantive evidence of Bennett's involvement in the theft of the tower computers. All agreed her statements constituted "double hearsay." J.A. 335.

Mrs. Spangler did as she was told and McGinnis met Spangler at the truck stop. Spangler promptly told McGinnis that he had withheld information during the Tuesday interrogation because "he felt like he would be singled out" for his "background." J.A. 338. Indeed, Spangler had a felony larceny conviction; despite Spangler's apparent allusion to it, McGinnis later claimed he did not learn that Spangler was a felon until after Bennett had been arrested and indicted.[5] Spangler told McGinnis that <u>he and Mitchell</u> had "observed Clyde Bennett take three computers out the front door of the terminal in the dark while David Lowrey . . . was down at the guard building distracting the guard." J.A. 339-40. McGinnis told Spangler that he wanted a written version of Spangler's statement, and Spangler agreed to provide one. <u>In fact, as McGinnis later learned, Spangler was not at work on the night that the computer terminals went missing</u>.

After Spangler told McGinnis that he and Mitchell had observed Bennett and Lowrey acting together, McGinnis promptly interviewed Lowrey for a second time. That interview lasted around 45 minutes and "got a little heated" when Lowrey was

---

[5] In his investigative report prepared just a few weeks after the meeting, McGinnis wrote that Mrs. Spangler had told him that Spangler had originally withheld information because he was afraid that other employees would know he was the one providing information about the theft of the computer towers.

12

confronted with the information provided by Spangler. J.A. 346. Indeed, McGinnis described the second Lowrey interview as "<u>intense</u> and heated." J.A. 781 (emphasis added). McGinnis brought enormous pressure to bear on Lowrey, "advis[ing] Lowrey that he WAS going to be arrested unless he cooperated." J.A. 781 (emphasis in original). In both his trial testimony and in his investigative report, McGinnis averred that he told Lowrey that he knew Clyde Bennett had acted with him to steal the three tower computers.[6] Eventually, after hearing Spangler's version of the alleged theft as recounted to him by McGinnis, Lowrey told McGinnis that on the night of the theft he [Lowrey] was merely talking to the terminal guard while Bennett stole the computers. McGinnis did not believe this account, writing in his investigative report that, "Lowrey was lying about this to take the heat off him." J.A. 781. Lowrey further told McGinnis that the day after Bennett stole the three tower computers, Bennett and Lowrey met at a 7-Eleven store and Lowrey purchased one of the computer towers for $250.

Lowrey, who unbeknownst to McGinnis at the time had prior convictions for cocaine possession and writing bad checks, told

---

[6] The district judge described the process by which McGinnis shared what Spangler already told him as "feeding him information and he is repeating it," to which McGinnis replied, "I'm not telling him what to say. Telling him what I heard and he is agreeing that is the way it happened." J.A. 350.

13

McGinnis that the computer tower he purchased from Bennett was at his home. At McGinnis's insistence, Bullard and McGinnis immediately accompanied Lowrey to the latter's home to retrieve the computer. Before Bullard, McGinnis, and Lowrey departed for Lowrey's home, however, McGinnis instructed the terminal manager, Finley, to call the police to report the theft and to request their presence upon McGinnis's return, "when [he] would press formal charges." J.A. 781. At trial, McGinnis testified that he was planning to press charges against Lowrey alone at this point. Regional manager Bullard testified, however, that McGinnis told him that he had also decided to have Bennett arrested before the police arrived at the terminal that day. Plainly, the jury was entitled to find, as it did, that Bullard's testimony, as corroborated by the investigative report,[7] was accurate, and that McGinnis had determined to have Bennett arrested before the trio departed for Lowrey's home. Tellingly, when Bullard, McGinnis, and Lowrey arrived at Lowrey's home, Lowrey refused to permit Bullard and McGinnis to enter. Rather, Lowrey went in alone and returned with the computer, still in its box.

---

[7] McGinnis's investigative report states that upon his return to the terminal with the computer from Lowrey's home, he "explained what had transpired and notified the police that we wanted to press formal charges against both Lowrey AND Bennett." J.A. 782 (emphasis in original).

14

When Bullard, McGinnis, and Lowrey returned with the computer tower to the terminal, Lowrey was questioned formally by a property detective for about 45 minutes. The police determined that he would be charged with Theft by Receiving Stolen Goods. Lowrey consented to a search of his home and left the terminal accompanied by a detective who would perform the search. No seizures resulted from a subsequent search of Lowrey's home.

Meanwhile, McGinnis informed the police that Bennett had not been warned of any suspicion against him yet, and that his only interview of Bennett was the preliminary one made before the Spangler allegations. Bennett was brought into a manager's office and questioned by the police for about 12 minutes, with McGinnis and Bullard present but apparently not participating. McGinnis's investigative report recounts that, "Bennett was . . . notified that we KNEW how he had taken the items out of the terminal and further that we knew how he had sold one of the computers to Lowrey, which we had confiscated from Lowrey." J.A. 782 (emphasis in original). Bennett continued to deny any knowledge of or involvement with the disappearance of any computers. He was required to remain in the manager's office with Finley while the police officers and McGinnis left. The officers returned 35-40 minutes later, and arrested him for grand larceny (the formal charge would ultimately be

15

embezzlement), placed him in handcuffs, and escorted him from the premises "in full view of the dock employees." J.A. 782. Although the officer who made the formal arrest testified that he was not influenced by any R&L employee in his decision to arrest Bennett and to march him, handcuffed, in front of employees, the jury was entitled to reject this testimony. This is particularly true in light of the fact that, as Bennett was led out of the room, terminal manager Finley told him that he was fired.

The next day, Thursday, McGinnis interviewed Mitchell, the dockworker who handled the shipment of missing laptops with Spangler, for a second time. Mitchell told McGinnis that he had not provided information earlier because his parents had advised him to "stay out of the matter," J.A. 783, but that Spangler had convinced him to talk. At this second interview, after Bennett had already been arrested, McGinnis's investigative report averred that Mitchell "basically stated exact[ly] what Conan Spangler had informed me of," J.A. 783, i.e., that he and Spangler had observed Bennett take the desktop computer towers from the dock while Lowrey distracted the guard.

Before McGinnis left Richmond for Atlanta on Friday, Spangler provided a written statement as he had agreed at their last meeting. The statement, however, differed significantly from what he and Mitchell told McGinnis in person over the

16

previous couple of days. Rather than asserting that Bennett and Lowrey had been seen by both men removing the computers and distracting the guards, Spangler's written statement reported that, "Dave Lowrey has told me that he goes to the guard shack and distracts the guard while Clyde takes stuff out the front door to the vehicles." J.A. 786. McGinnis did not mention the statement in his investigative report, nor did he ever share it with police or otherwise advise prosecutors of the discrepancies in Spangler's and Mitchell's stories.

After initially agreeing to take lie detector tests, Spangler and Mitchell ultimately refused to consent to the tests. Both men failed to report to work after this refusal and were terminated by R&L with no further investigation into their conduct.

A few months later, in November 2006, a preliminary hearing in Bennett's embezzlement case was held to determine probable cause. Finley, Lowrey, and McGinnis all testified, repeating essentially what is recounted above. McGinnis was not asked about, and did not offer, any of his observations about the reliability of the information he had obtained from Mitchell and Lowrey (although when describing his own understanding of how Bennett stole the computers, he did mention his belief that Lowrey had purposefully distracted the guard). He also did not mention that Spangler's story – which he shared with Lowrey

17

during his second interview and had apparently been adopted directly by Mitchell – was inconsistent with his interviews and written statement.

Finding probable cause, the preliminary hearing judge certified to the grand jury the embezzlement charge against Bennett, who was indicted and set for trial. The case was <u>nolle prossed</u>, however, when Lowrey failed to appear either for Bennett's trial, where he was a material witness, or for his own trial (scheduled for the same day). The prosecutor for both cases testified that Lowrey's disappearance was the reason the <u>nolle prosequi</u> was entered in Bennett's case.

B.

In June 2008, about a year and half after the embezzlement charge against him was dropped, Bennett initiated this action in state court for malicious prosecution, and the action was removed to federal district court on the basis of diversity of citizenship jurisdiction.[8] The named defendants included R&L, terminal manager Finley, regional manager Bullard, and company investigator McGinnis. Bennett alleged that "the criminal prosecution brought against [him] was intentionally initiated,

---

[8] Bennett, who is African-American, amended his complaint after the case was removed to federal court to assert a racial discrimination claim under 42 U.S.C. § 1981, but the district court granted judgment as a matter of law in favor of all defendants on this claim, which is not before us in this appeal.

18

caused, set afoot, instituted, continued, maintained and/or cooperated in by Defendants wholly without probable cause and was malicious, done in bad faith, with actual malice and with the intent to injure[.]" J.A. 18-19.

After several days of trial testimony on liability only, the jury returned a verdict against each of the defendants on the malicious prosecution claim. At the subsequent damages phase of the trial, Bennett's brothers testified that he had been "isolated" since the arrest and "not the same at all." J.A. 559. He was also described as "very subdued" and "very withdrawn." J.A. 560-61. Bennett testified that the arrest made him "humiliated, embarrassed" and that he felt "betrayed by his employer" for being "paraded in front of [his co-workers] like a common criminal." J.A. 562, 564.

At the time of his arrest, Bennett was earning approximately $41,600 per year at R&L. After he was fired, Bennett applied for more than 100 jobs but was able to secure only part-time employment with his brother, making around $8 per hour. (Bennett testified that he would enter "accused of theft" on applications that asked why he left his last job, J.A. 564.) During this period he was also without medical insurance and was unable to afford care for various conditions. To support himself during this period, Bennett emptied a money market retirement

19

account of approximately $81,000 and an annuity worth approximately $28,000.

The jury ultimately awarded Bennett $1,716,920 in compensatory damages. In addition, they assessed punitive damages of $1,500,000 against R&L, $3,000 against terminal manager Finley, $15,000 against regional manager Bullard, and $30,000 against McGinnis. The defendants renewed their motions for judgment as a matter of law under Fed. R. Civ. P. 50(b), and sought, in the alternative, a new trial under Rule 59. The district court considered the motions in a thorough opinion. The court granted the motions for judgment as to Finley and Bullard, and it remitted the punitive damages award as required by Virginia law to $350,000. In all other respects, the court denied the motions. The defendants timely appealed to this Court.

## II.

In denying the motions before us on review, the district court undertook a careful evaluation of all the Appellants' contentions raised now, and rejected their insistence that the case should never have been submitted to the jury, and that the damage award was unlawfully excessive. We can hardly improve upon the district court's analysis, and so we set it forth below in detail.

Appellants first argue that the district court improperly denied their motion for judgment as a matter of law as to the probable cause element of malicious prosecution. As already mentioned, denial of such a motion is reviewed de novo, with this Court examining the evidence in the light most favorable to the non-moving party to determine "whether a reasonable trier of fact could draw only one conclusion from the evidence." Brown v. CSX Transp., Inc., 18 F.3d 245, 248 (4th Cir. 1994) (citing Townley v. Norfolk & W. Ry., 887 F.2d 498, 499 (4th Cir. 1989)).

Appellants assert that the following undisputed facts compel the singular conclusion that there was probable cause to call for Bennett's arrest: the computer towers were missing from the OS&D area, Bennett was the last person to leave the terminal on the last night the towers were there, McGinnis interviewed ten employees before calling the police, Spangler gave McGinnis an eyewitness account of Bennett and Lowrey's theft, Lowrey confirmed Spangler's story and added further information implicating Bennett, and prior to the arrest McGinnis had been given no information suggesting that any other employee had taken the items. In addition to these facts, Appellants further assert that the district court misread Virginia law on the informant accomplice rule, focusing on the reliability of the

informant rather than the reliability of the information provided by him.

As to both probable cause and the application of the informant accomplice doctrine, we find the district court's reasoning to be rigorous and accurate, and its legal conclusions sound. We therefore adopt the analysis set out below:

> The Defendants argue that Bennett failed to establish that the Defendants lacked probable cause at the time they instituted criminal proceedings against Bennett. In Virginia, in the context of a malicious prosecution action, probable cause is defined as "knowledge of such facts and circumstances to raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected." Andrews v. Ring, 585 S.E.2d 780, 786 (Va. 2003). "The determination whether a defendant had probable cause to believe that a crime was committed is judged with reference to the time the defendant took the action initiating the criminal charges." Stanley v. Webber, 531 S.E.2d 311, 314 (Va. 2000). Thus, the relevant inquiry is whether the Defendants had probable cause to believe that a crime was committed by Bennett at the time McGinnis told Officer Deveney that "[R&L] wanted to press formal charges against both Lowrey AND Bennett."

> \* \* \* \* \*

> The Defendants argue that, as a matter of law, their probable cause determination was sound because it was based on the confession of an alleged accomplice of Bennett's—Lowrey. The Defendants correctly state that "information received from one admitting his participation in a crime is sufficient to create probable cause for prosecution, if there is no reason to doubt its truth." So. Ry. Co. v. Mosby, 70 S.E. 517, 521 (Va. 1911). Indeed, in Mosby, "there [wa]s no ground upon which it could be fairly concluded that [the investigator for the railroad whose shipments had been stolen] knew that the sources from which he got his information were not reliable

22

before he instituted th[e] prosecution." Id. The Western District of Virginia, citing Mosby, echoed this proposition, explaining that, "[i]f there is no reason to doubt the truthfulness of the accomplice when the prosecution was initiated, there is still considered to be probable cause sufficient to negate a malicious prosecution claim even if the witness was later shown to be unworthy of belief." Caldwell v. Green, 451 F. Supp. 2d 811, 818 (W.D. Va. 2006).

Bennett does not challenge that this is indeed the law in Virginia, but, instead, he emphasizes correctly that "Virginia courts will find probable cause only if the informant is reliable and trustworthy," and he contends that the alleged informants—Lowrey, Spangler, and Mitchell—"do not pass the reliability requirement." The discussion of Spangler and Mitchell under Mosby, however, is misplaced because neither Spangler nor Mitchell implicated themselves as Bennett's accomplices. Instead, Spangler and Mitchell implicated only Bennett and Lowrey, and, therefore, Spangler and Mitchell did not "confess" to anything that would make a probable cause determination sound under the "informant accomplice" principle upon which the Defendants rely. Accordingly, statements from Spangler and Mitchell do not fall under the "informant accomplice" probable cause rule. Nevertheless, Bennett's discussion of the application of the principle as to Lowrey under Mosby is on point.

McGinnis noted no less than four times in his investigation report that, by the time prosecution was initiated, there was serious reason to doubt Lowrey's truthfulness. Specifically, McGinnis noted that "the mannerisms of ... Lowrey ... left [him] with a feeling that [he was] not being truthful." [J.A. 779-80.] McGinnis noted also that "Lowrey was lying ... to take the heat off of him." [J.A. 781.] Additionally, when Lowrey told McGinnis that he did not know that the computer he allegedly purchased from Bennett was stolen, McGinnis noted that "this was another lie." [J.A. 781] Similarly, when Lowrey told McGinnis that he did not know where the other two computers were, McGinnis noted that this, too, was "another lie." [J.A. 781] At trial, McGinnis tried to soften his

23

previously recorded statements by saying that Lowrey was "deceptive in some of his answers." [J.A. 104.] But, McGinnis did not deny that, before he decided to press charges against both Lowrey and Bennett, he actually believed that Lowrey was an established liar and that the lies related to important matters coming from the person who was the key witness implicating Bennett in the theft. More troubling still, Lowrey did not implicate Bennett until McGinnis effectively fed Lowrey the information that he had received from Spangler-a man whom McGinnis also believed to be untruthful—and only then did Lowrey implicate Bennett. Therefore, Lowrey, the alleged informant accomplice, appears only to have "confessed" and "informed" on Bennett once McGinnis led him in that direction. Moreover, even when Lowrey finally implicated Bennett by agreeing with a story given to McGinnis by Spangler, and then by McGinnis to Lowrey, McGinnis still did not believe that Lowrey was telling him the truth. Accordingly, McGinnis had every reason to, and did in fact, "doubt the truthfulness of the accomplice when the prosecution was initiated." Caldwell, 451 F. Supp. 2d at 818. Therefore, the information received from Lowrey, the "one admitting his participation in a crime," was unreliable and was not legally sufficient to create probable cause for prosecution. Indeed, under the circumstances, Lowrey's statement was so tainted and unreliable that it was of no real probative value even when considered with the other information known to McGinnis.

Even without the aid of the "informant accomplice" rule, the Defendants assert that McGinnis had probable cause when he "asked Finley to call the authorities and/or at the time he said R & L would press charges." Defs.' Mem. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem. Supp.") at 17. The Defendants argue that the following facts known to McGinnis at the time he decided to have Bennett arrested gave him probable cause to initiate Bennett's arrest:

> (1) Bennett, a supervisor, was responsible for theft prevention. (2) Lowrey and Bennett were the last to leave [so] Bennett had access to the stolen computers. (3) The OS & D was open [so] the three bulky boxes were likely in OS & D prior to the time that

24

Lowrey and Bennett left. (4) [According to Spangler and Lowrey,] Lowrey was talking with the guard while Bennett took the computers out the front door.... (5) [According to Lowrey,] Lowrey had paid $250 to Bennett for one of the stolen computers and that it was at his house. (6) Spangler had also implicated Bennett.

These points, individually and collectively, misapprehend in a material way the evidence adduced at trial and the inferences which the jury was entitled to draw from that evidence about what the Defendants knew at the time they request the police to arrest Bennett.

Thus, the evidence proved at trial that Bennett was first implicated in the theft of the March 17, 2006, tower computers by Spangler, a man whom McGinnis believed to be deceptive and untruthful from the very beginning. Second, from the outset, McGinnis strongly suspected that Spangler had been involved in the theft of the March 3, 2006, shipment of 13 laptops. Then, too, Spangler only came forward to implicate Bennett in the March 17, 2006, theft after Spangler believed (as relayed to McGinnis by Spangler's wife), from his two heated interviews with McGinnis, that he, himself, would be going to jail for theft. The jury thus reasonably could have found that McGinnis was not entitled to, or, indeed, did not, rely on what Spangler, whom McGinnis believed to be a liar, told him in the third interview when he recited a story implicating Bennett.

McGinnis fed Spangler's story to Lowrey, a man McGinnis had also believed to be a liar from the very beginning, and Lowrey, after a heated conversation, agreed with the third Spangler story, simply by saying that it was "the way it happened." McGinnis, believing that Lowrey was continuing to lie and that he also knew where all three of the missing HP tower computers were, then accompanied Lowrey to Lowrey's home where Lowrey refused to allow McGinnis into his home and produced only one of the three missing tower computers. McGinnis returned to the Richmond Terminal from Lowrey's home and immediately asked to press charges against Lowrey and Bennett.

25

In simple terms, then, McGinnis knew the following when he made the decision to press charges against Bennett: a liar, likely involved in a recent company computer theft, who was admittedly concerned about his own penological interests, changed his story and told a company investigator that the liar's shift supervisor was involved in a second, more recent company computer theft. Later that night, the investigator deliberately fed a second liar the first liar's story, and this second liar, who was also implicated in the story, ultimately adopted the story, but deflected all criminal blame onto the shift supervisor. The second liar then, after refusing to allow the investigator into his home, produced from his home one of three missing computers, but the investigator believed the second liar also knew where the other two missing computers were located and was continuing to lie on that point. Based on the first and second liars' stories, and a single ten minute interview with the shift supervisor wherein the supervisor protested his innocence, the investigator decided to have the shift supervisor arrested. A jury reasonably could have concluded from this record that there was a lack of probable cause to believe that Bennett committed the crime.

The Defendants argue that "[w]hat McGinnis did not know, even if from Bennett's perspective he should have known, is implicitly immaterial [to the probable cause inquiry]." Defs.' Mem. Supp. at 17. To that end, the Defendants, though unarticulated precisely as such, pose the following question to the Court: "Does determining whether the Defendants had probable cause to initiate the Plaintiff's arrest include any consideration of that which the Defendants did not know or do, but purportedly should have known or done?" Defs.' Mem. Supp. at 2-3. While the Supreme Court of Virginia has already answered this question in the negative, the inquiry is irrelevant to this case because a reasonable jury could have determined that McGinnis did not have probable cause to have Bennett arrested without consideration of facts that he arguably should have discovered. In any event, the Defendants' argument is misdirected because the four items of evidence to which it is directed are

26

probative respecting the element of malice and the propriety of a punitive damage award.

However, as to the Defendants' argument, they are correct in stating that, at the time the arrest decision was made, they did not yet know that: (1) Lowrey was a convicted felon, (2) shortly after the arrest, Spangler would write a contradictory statement, (3) Spangler had not worked the night he claimed to have witnessed the theft, or (4) Bennett was financially comfortable. And, the Defendants are correct that such knowledge could not be considered by the jury in deciding the element of lack of probable cause. Indeed, the jury was properly instructed on this point by Jury Instruction 25. There is no reason to believe that the jury disregarded the instruction.

While this knowledge certainly would have further informed the determination that probable cause did not exist, the record about knowledge that McGinnis did possess at the time of the arrest decision, as detailed above, without weighing the evidence or considering the credibility of the witnesses, clearly provided a legally sufficient evidentiary basis for a reasonable jury to find for Bennett as to the probable cause element of his malicious prosecution claim. Thus, Bennett did not fail to make a showing on this essential element of his case.

744 F. Supp. 2d at 514-18 (footnotes and some citations omitted or altered; some punctuation altered).

While Appellants correctly note that the Virginia Supreme Court has been willing to reverse jury verdicts on review of the probable cause issue in malicious prosecution cases, such cases typically involve far stronger evidence of the suspect's wrongdoing than the record before this Court provides. In Reilly, for example, the court found probable cause where an arrest was made after fingerprints were matched to the plaintiff

27

and estimated by an expert to have been left around the time of a robbery; the plaintiff had been sought out over a period of months for interviews but could not be located; the plaintiff matched the victim's physical description with unusual accuracy; and he lived close to where the crime was committed. Reilly, 643 S.E.2d at 217-18, 219. The investigating police officer in Reilly had no reason to doubt the reliability of the information he had received from the victim or experts consulted, and "there were no circumstances know to [him] pointing to any person other than [the plaintiff]." Id. at 219.

In Commissary Concepts Management Corp. v. Mziguir, 594 S.E.2d 915 (Va. 2004), as well, probable cause was found where an employer knew money had been missing from the plaintiff's shifts in the past; a bank teller reported that extra cash from a deposit had been returned to the plaintiff; the money was searched for in the workplace and in the safe where deposits were stored and was not found; no report of the overage was made; and the plaintiff had not mentioned the missing cash despite working shifts after he had received it. 594 S.E.2d at 918. Again, the employer in Mziguir had no reason whatsoever to question the reliability of information from the bank teller, and had observed what seemed to be a pattern of theft related to the plaintiff's access to cash on-site. See also Bill Edwards Oldsmobile, Inc. v. Carey, 244 S.E.2d 767 (Va. 1978) (finding

28

probable cause as a matter of law where the defendant had many months of interactions with the plaintiff regarding unauthorized and unpaid charges for car parts, the plaintiff had apparently left town, the car with the embezzled parts was located at the plaintiff's friend's house, and no reliability issues regarding information or informants were ever raised).

In contrast to these cases, the Appellants here had, from the beginning of their brief and ham-handed investigation, strong reason to know, and indeed, actual knowledge, that their informants were unreliable. McGinnis's report indicates that he found Spangler and Mitchell both "deceptive," and believed Lowrey's mannerisms indicated he was being "untruthful." J.A. 779, 780. When Lowrey was questioned most intensely, and apparently confirmed that Bennett had stolen the computers, McGinnis believed his version of events still contained lies about his own involvement. Furthermore, unlike in Mziguir, Reilly, and Bill Edwards, there was not a scintilla of corroborating physical evidence or any pattern of behavior already observed by the employer in the instant case to bolster or confirm the accounts given by employees who McGinnis believed were lying to him.

McGinnis's own admitted doubts about the reliability of his informants, at the time he received their accounts implicating Bennett, and a total lack of objective evidence to corroborate

their claims support the district court's denial of judgment as a matter of law on probable cause. In so ruling, we agree with the district court that to the degree the informant accomplice doctrine applies to informant statements from Spangler and Lowrey, who never in fact admitted their role in the conduct at issue, see 744 F. Supp. 2d at 515, those statements are properly disregarded for the determination of probable cause where an informant is so evidently unreliable.[9]

B.

Appellants next argue that the district court erred in denying judgment as a matter of law on the dispositive element of malice. They argue that no evidence was offered of a malicious motive on McGinnis's part, and that the district court improperly inferred malice from a mere failure to undertake certain investigative steps.

As above, we find the district's court analysis on the issue of malice, which again rejected the Appellants' contentions, to be clearly-put, accurate and persuasive:

---

[9] Appellants also argue that the district court erred by giving a jury instruction that the statements of Lowrey and Spangler could be considered only on the question of malice, and not on the question of the existence of probable cause. Because the limited use of the statements was conceded by Appellants below and the record indicates that the limiting instruction to the jury was in clear reference to these conceded uses, Federal Rule of Civil Procedure 51(d)(2) concerning plain error does not apply and we need not address this issue further.

The Defendants also assert that Bennett failed to establish the element of "malice." In Virginia, "malice" means "any controlling motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished." Hudson v. Lanier, 497 S.E.2d 471, 473. Virginia also recognizes that "[m]alice may be inferred from a lack of probable cause." Reilly, 643 S.E.2d at 219. Malice can be inferred from a lack of probable cause, however, only when the circumstances of the case support the inference. See Freezer v. Miller, 176 S.E. 159, 168 (Va. 1934); see also Giant of Virginia, Inc. v. Pigg, 152 S.E.2d 271, 276 (Va. 1967); Gaut v. Pyles, 181 S.E.2d 645, 647 (Va. 1971).

The Defendants' malice argument, though not articulated precisely as such, is as follows: Bennett did not adduce evidence of any improper controlling motive, so the jury must have inferred malice from its finding of a lack of probable cause; however, a lack of probable cause alone does not support an inference of malice, and the circumstances of the case do not otherwise support the inference; thus, the jury improperly presumed or imputed malice. For the reasons set forth below, the Defendants' argument fails.

The Defendants are correct in arguing that, in Virginia in a malicious prosecution suit, malice does not attach automatically when the absence of probable cause is shown. It is indeed well-established that the "malice" required in a malicious prosecution case is not imputed as a matter of law by a simple showing of the absence of probable cause, but must be proven as a separate and distinct element of the plaintiff's claim. Freezer, 176 S.E. at 168. It is equally well-established, though, that legal malice may be proven by inference from a lack of probable cause if the circumstances of the case support the inference. Id. In other words, the "[w]ant of probable cause is evidence of malice." Mosby, 70 S.E. at 520.

The Defendants' argument that the "[l]ack of probable cause alone is insufficient to support an inference of malice," Defs.' Mem. Supp. at 12, fails as a matter of law. In Virginia, under certain circumstances, the want of probable cause alone can serve as legally sufficient evidence to support an

31

inference of malice. See Pigg, 152 S.E.2d at 276; see also Oxenham v. Johnson, 402 S.E.2d 1, 2 (Va. 1991). In these instances, "there [i]s such a want of probable cause" that an inference of legal malice is warranted. Pigg, 152 S.E.2d at 276 (The malicious prosecution defendant's "disregard of information communicated to him constituted an aggravated circumstance which supports the finding of the jury that there was such a want of probable cause as warranted an inference of legal malice."); Oxenham, 402 S.E.2d at 2 (The defendant's "lack of probable cause [alone] was sufficient to support an inference of [the defendant's] legal malice" where the defendant had "caused [an] arrest warrant to issue" against the plaintiff solely because the plaintiff had refused to let the defendant search the plaintiff's residence without a search warrant.).

As the controlling decisions are applied to this record, a reasonable jury certainly could have determined that "there was such a want of probable cause" at the time McGinnis told the police that he wanted to press charges against Bennett as to warrant an inference of legal malice. Pigg, 152 S.E.2d at 276. The fact that McGinnis decided to have Bennett arrested before the police were involved in any way and based solely on the word of witnesses whom he believed to be liars may reasonably be said to constitute the type of "aggravated circumstance" indicative of such a want of probable cause that an inference of legal malice was warranted. Indeed, the facts and circumstances behind the jury's finding of the want of probable cause are legally sufficient to support an inference of legal malice. In other words, the same facts and circumstances that counseled the jury toward a determination that probable cause did not exist may similarly have supported an inference that the Defendants acted with legal malice.

Again, "legal malice" is defined as "any controlling motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished." Hudson, 497 S.E.2d at 473. The Defendants argue that Bennett did not adduce "evidence of any motive other than a desire to catch a thief." Defs.' Reply Mem. at 4. The Defendants then ask, as a

32

matter of law, "May a plaintiff establish malice without any evidence of a controlling motive and purely rely on inferring motive from a lack of probable cause?" While the Defendants answer the question in the negative, Defs.' Reply Mem. at 4, the Court answers the question in the affirmative.

As previously explained, legal malice may be proven by inference from a lack of probable cause if the circumstances of the case support the inference. Put differently, any controlling motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished may be proven by inference from a lack of probable cause if the circumstances of the case support the inference. Thus, an improper motive—legal malice—may be inferred where supported by the case's facts and circumstances. As such, the fact that Bennett did not label and identify explicitly an alleged improper motive, and the fact that the jury did not make an explicit finding as to precisely what they believed the Defendants' improper motive was, is of no consequence. The Court is not aware of any authority that requires otherwise.

Bennett showed facts and circumstances that were legally sufficient to support an inference that the Defendants acted with an improper motive based on the lack of probable cause. For example, the evidence of want of probable cause suggested that one such improper motive may have been a desire to see not that the guilty were punished, but that anyone was punished. In other words, deciding to press charges against the first man accused by men believed by McGinnis to be untruthful criminals does not tend to demonstrate a good faith desire to see that the truly guilty individual is punished. It shows, instead, a bare desire to punish in general and to put an end to a frustrating investigation. That, of course, would be an improper controlling motive which would support a finding that the Defendants acted with legal malice.

Moreover, the record shows additional evidence probative of malice (apart from the want of probable cause). For example, McGinnis decided to have Bennett arrested without even examining Lowrey's criminal

33

record (he was a convicted felon) and without ascertaining whether Spangler even could have been present to see what, on his third interview, he claimed to have seen. In fact, a check of company records would have disclosed that Spangler did not work on the evening in question. And, a check of the criminal records of the witnesses whom McGinnis thought to be liars would have shown that Lowrey had a felony conviction. And, the corroboration process would have shown that Bennett had no criminal record and was comfortably situated financially. Corroboration is most important when dealing with the testimony of known liars. Nor did McGinnis inform the police that he thought Lowrey was a liar or that Lowrey's version of events was merely the adoption of a story told by Spangler, another person McGinnis thought to be a liar. And, McGinnis did not bring to the attention of the prosecutor or the Virginia courts the fact that Spangler's written story differed markedly on important points from the version adopted by Lowrey or that Lowrey had a felony conviction or that Spangler had not been at work on the evening at issue. Although those events occurred after Bennett had been arrested, the disclosure of all or any of them would have been important in deciding whether the arrest had been warranted. The failure to disclose them, therefore, is probative of the existence of a state of mind at the time of the arrest other than seeing that the guilty person would be punished. Furthermore, nothing in the record disclosed any reason that would have warranted the rush to judgment that was shown at trial. Nor was it shown that checking company work schedules and criminal backgrounds would have been difficult in the least. The failure to corroborate the evidence given by known liars and the failure to disclose pertinent information to the prosecutor or the courts, taken together (as well as in perspective of the want of probable cause), further support a finding that Bennett proved the malice element.

The jury may have inferred such a motive, or it may have inferred a separate, similarly legally sufficient motive from the underlying facts and circumstances or from the absence of probable cause. In either event, a legally sufficient basis existed for the jury's finding that the Defendants initiated

the criminal proceedings with malice. Therefore, without weighing the evidence or considering the credibility of the witnesses, the Court concludes that Bennett did not fail to make a showing on this essential element of his case, and the Defendants are not entitled to judgment as a matter of law.

744 F. Supp. 2d at 521-24 (footnotes omitted; some citations altered).

We agree with the district court that McGinnis's decision to press charges against Bennett solely on the basis of information from informants he considered unreliable and deceptive, along with his failure to seek the most basic corroborating information for these accounts, supports a jury finding as to malice. At the very least, this evidence precludes judgment as a matter of law in favor of the Defendant-Appellants.

C.

The Appellants' final argument as to judgment as a matter of law is that the district court erred in ruling that a <u>nolle prosequi</u> entry for a criminal charge is an outcome "not unfavorable to the plaintiff" in a malicious prosecution action. They argue that Bennett had an affirmative burden to show that the <u>nolle prosequi</u> was entered for reasons that imply innocence, and that the entry in Bennett's criminal trial was due only to Lowrey's flight. We adopt, again, the court's rejection of Appellants' contention:

35

The Defendants argue that the Court erred in determining that the Commonwealth of Virginia's decision to nolle prosequi the embezzlement charge against Bennett constituted a termination of the prosecution "in a manner not unfavorable to" Bennett. They argue also that the proceeding has not terminated at all because the Commonwealth still has an intent to prosecute Bennett for the embezzlement if Lowrey ever surfaces. In their Rule 50(b) motion, the Defendants rely on Nicholas v. Wal-Mart Stores, Inc., 33 Fed. App'x 61 (4th Cir. 2002) and Niese v. Klos, 222 S.E.2d 798 (Va. 1976).

In Nicholas, the plaintiff, a former Wal-Mart cashier, had been arrested on the complaint of Wal-Mart management, and charged with a breach of trust for allowing a customer to leave the store without paying for merchandise. The Fourth Circuit was tasked with interpreting the South Carolina Supreme Court's holding in McKenney v. Jack Eckerd Co., 402 S.E.2d 887 (S.C. 1991) that, "where an accused established that charges were nolle prossed for reasons which imply or are consistent with innocence, an action for malicious prosecution may be maintained." In Nicholas, the Fourth Circuit "predict[ed]" that the South Carolina Supreme Court would find that plaintiffs asserting a claim for malicious prosecution have the affirmative burden of proving that the nolle prosequi was in fact entered under circumstances which imply or are consistent with innocence of the accused. Nicholas, 33 Fed. App'x at 64-65. Nicholas, is, however, an unpublished Fourth Circuit case interpreting South Carolina law, predicting what the South Carolina Supreme Court would hold. Nicholas, therefore, is in no way binding on this Court, and the Court does not find it persuasive in the least as to Virginia law.

In Niese, the Supreme Court of Virginia held that, "upon entry of the Nolle prosequi order, evidencing the unwillingness of the Commonwealth to proceed, the prosecution terminated in a manner not unfavorable to plaintiff for purposes of instituting a malicious prosecution action." Niese, 222 S.E.2d at 800-01 (citing Graves v. Scott, 51 S.E. 821 (Va. 1905) and Keaton v. Balser, 340 F. Supp. 329 (W.D. Va. 1972)). The Defendants argue that, under Niese, whether the Commonwealth's decision not to proceed is

a "termination not unfavorable to the plaintiff" must be determined by "whether there was evidence of the Commonwealth's '[un]willingness ... to proceed.'" Defs.' Mem. Supp. at 21 (quoting Niese, supra, 222 S.E.2d at 801). The Defendants, however, misread Niese.

A proper reading of Niese reveals that the Court believed that the entry of a nolle prosequi, in and of itself, evidences the Commonwealth's unwillingness to proceed with the prosecution at that time. The context of the Niese holding does not indicate that the plaintiff has an affirmative burden to prove that the nolle prosse in fact evidenced the Commonwealth's unwillingness to proceed, and an analysis of the cases upon which Niese rests its holding—Graves and Keaton—confirms this interpretation.

In Keaton, the Western District of Virginia stated plainly that, "[s]ince the Commonwealth Attorney nolle prossed the warrant for leaving the scene of the accident on which the malicious prosecution claim in this action is based, it is apparent that the second element requiring termination in the plaintiff's favor has also been established." Keaton, 340 F. Supp. at 332. In other words, the simple fact that the Commonwealth had nolle prossed the underlying criminal charge satisfied the element requiring that the plaintiff show that the criminal prosecution terminated in a manner not unfavorable to him.

More importantly, in Graves, the Supreme Court of Virginia expressly considered and rejected both positions that the Defendants advance here. In Graves, the Court acknowledged that a nolle prosse had at one point been perceived as failing to satisfy the "termination in a manner not unfavorable to" requirement of a malicious prosecution case because it "did not establish the innocence of the [malicious prosecution] plaintiff, or show want of probable cause on the part of the [malicious prosecution] defendant." Graves, 51 S.E. at 822. Indeed, a nolle prosse and other forms of "termination" had been held not to have actually "terminated" the prosecution because, if no testimony had been heard that caused the criminal defendant to be discharged, it was not a "final

37

termination." Id. However, the Supreme Court of Virginia expressly rejected that outdated reasoning and agreed with the more modern approach in recognizing that "a nolle prosequi ends the indictment past recall, and thereupon the right to a malicious prosecution suit is perfected." Id. at 823.

Since Graves, the only time Virginia courts have acknowledged that a nolle prosse can defeat a subsequent suit for malicious prosecution is if the nolle prosse was the result of a voluntary compromise between the then-criminal defendant and the Commonwealth. Andrews, 585 S.E.2d at 787 ("A voluntary compromise ending a criminal prosecution defeats a subsequent suit for malicious prosecution."). Therefore, as Bennett's underlying criminal prosecution was not nolle prossed as a result of voluntary compromise, the termination of the criminal proceeding—the initial embezzlement charge—terminated the proceeding "past recall," and it terminated the proceeding in a manner not unfavorable to Bennett as a matter of law.

Id. at 524-25 (footnotes omitted; some citations altered).

To reiterate, Virginia has recognized only one exception to the rule that an order of nolle prosequi permits a malicious prosecution claim to go forward, namely cases where the order was entered as a result of an agreement between the government and defendant. See, e.g., Orndoff v. Bond, 39 S.E.2d 352 (Va. 1946); Synder v. City of Alexandria, 870 F. Supp. 672 (E.D. Va. 1994) (suggesting that agreements are an "example" of a non-qualifying nolle prosequi situation, but declining to name any others). Because the order entered in Bennett's embezzlement case was not the result of an agreement with the government, the

38

district court properly held under Niese that the outcome was one "not unfavorable to him" as a matter of law.

### D.

Notwithstanding our conclusions above as to the matters of law, the Appellants finally appeal to this Court to vacate the compensatory and punitive damages award and order a new trial, on the grounds that the amounts were "bizarrely excessive." Appellants' Br. 33. "A district court's denial of a request for a new trial or request for remittitur rests with the sound discretion of the trial judge and will not be reversed absent an abuse of discretion." Stamathis v. Flying J, Inc., 389 F.3d 429, 436 (4th Cir. 2004) (affirming $350,000 punitive damages judgment under Virginia law).

Where the conduct in question occurred in Virginia, "[w]hether [a] verdict should be set aside as excessive is a matter of Virginia law." Id. at 438. This law compels a court to set aside a verdict "if the amount awarded is so great as to shock the conscience of the court and create the impression that the jury has been motivated by passion, corruption, or prejudice, or has misconceived or misconstrued the facts or the law, or if the award is so out of proportion to the injuries suffered as to suggest that it is not the product of a fair and impartial decision." Shepard v. Capitol Foundry of Virginia, Inc., 554 S.E.2d 72, 75 (Va. 2001).

Addressing first the punitive damages, the Appellants argue that Bennett offered no evidence that McGinnis was motivated by "personal animosity or hostility," nor that he believed Bennett to be innocent or "was aware of any explanation potentially exonerating Bennett." Appellants' Br. 36. They assert that in the absence of any such evidence, the district court improperly relied on its perception of McGinnis's investigative failures or mistakes to support a finding of actual malice.

Our decision in <u>Stamathis</u> articulates the evidentiary requirements of actual malice for punitive damage awards:

> In cases involving malicious prosecution or defamation claims, punitive damages may be awarded if the defendant demonstrates, by clear and convincing evidence, that the defendant acted with actual or express malice . . . . Actual malice is defined as "conduct which is in conscious disregard of the rights of others and is wanton and oppressive."

> ***

> While we acknowledge that lack of probable cause alone does not infer actual malice, . . . it does lend support to a finding that the defendants acted with actual malice.

389 F.3d at 440, 441 (internal citations omitted). The Virginia Supreme Court has also explained, in somewhat nuanced terms, that punitive damages are appropriate in malicious prosecution cases where there is "evidence of misconduct or actual malice, or such recklessness or negligence as to evince a conscious

40

disregard of the rights of others." <u>Oxenham</u>, 402 S.E.2d at 5 (internal quotation marks and citation omitted).

In this case, the district court clearly relied (for purposes of Virginia law and Fed. R. Civ. P. 59) on the reckless and negligent aspect of actual malice set out above, in holding that there was a sufficient evidentiary basis for the jury's award. The court's opinion on the whole carefully enumerated the ways in which McGinnis failed to seek information from Bennett personally, failed to corroborate information provided by employees he believed to be deceptive, and failed to turn over to police Spangler's written statement which contradicted a crucial aspect of his initial story (i.e. that he had witnessed the theft). 744 F. Supp. 2d at 523-24. Its conclusion was that,

> [T]he jury's punitive damage award was not so excessive as to work an injustice. The facts and circumstances of this case, along with policy-related considerations, warranted a return of punitive damages. The jury's punitive award neither creates a miscarriage of justice nor offends any notion of fairness or justice. Hence, granting of a new trial is not justified.
>
> Indeed, the rush to judgment and the decisions to press an arrest on the uncorroborated evidence given by known liars, and the withholding of exonerating evidence from the police and the state court all support the imposition of punishment. And, the award also serves a deterrent purpose. Perhaps, in the future R & L and McGinnis will not be so quick to close a case, and perhaps they might fairly, objectively and fully conduct an investigation before having someone arrested. In other words, the punitive award should also deter wrongful conduct on future theft investigations at R & L. And, if after checking

41

for corroborative evidence, they determine that the word of a witness is confirmed to be of no value, they perhaps will refrain from pressing charges. And, if they do press charges and then, shortly thereafter, come across exonerating evidence, they will share it with the police and the courts.

This case clearly involved a miscarriage of justice but not the one of which the Defendants complain. The miscarriage, in fact, was visited on Clyde Bennett. The record shows clearly the miscarriage reflected in the jury's verdicts. Counsel for the Defendants expressed profound, numbing shock when the verdict was returned. That may be how the defendants and counsel felt. But, that reflects that they were (and remain) tone deaf to the wrongs proved by the record and to the damage those wrongs visited upon Clyde Bennett. This record shows beyond question that the verdict of the jury visited no miscarriage of justice on the Defendants.

Id. at 538-39.

The Appellants' arguments seeking to minimize the evidence adduced at trial as insufficient or improperly considered ignores the fact that under Virginia law, recklessness and negligence -- the failure to take proper care when undertaking an investigation -- can establish actual malice. See, e.g., Oxenham, 402 S.E.2d at 5. The district court cited ample evidence that McGinnis acted recklessly and/or negligently in the course of his investigation, evidence from which a reasonable jury could find actual malice. We therefore find no abuse of discretion in the award of punitive damages.

The real crux of the Appellants' damages claim is that the compensatory damages awarded -- including $1,159,698 for non-

42

pecuniary injuries -- were so excessive as to warrant vacatur. They argue that the verdict was contrary to Virginia law because it was so large as to "'shock the conscience' and to suggest that the jury was motivated by passion, and did not reach a fair and impartial decision." Appellants' Br. 38. The non-pecuniary award is shocking, they argue, in part because it is "far beyond any prior award ever affirmed by the Virginia Supreme Court," Appellants' Br. 38, as demonstrated by their table of cases on point from 1911-2011. Appellants' Br., Addendum A.

The district court's reasoning in upholding the compensatory damage award was, in summary:

> The jury saw that Bennett had been humiliated and demoralized both on the day of his arrest and for years thereafter, and wrongfully so. It saw that Bennett had endured mental suffering and distress, and needlessly so. It saw that his ability to provide for basic needs such as housing and insurance had been severely diminished, and that his personal relationships had been seriously altered as a consequence of the wrong done by the Defendants.

744 F. Supp. 2d at 535. In light of evidence of these injuries, the district court found the jury within the bounds of its proper judgment, and noted, "the verdict did not establish that the jury included in its damages anything not awardable in Virginia for malicious prosecution," nor had either party requested a special verdict form specifying amounts for various types of injury. Id. at 536.

43

While the non-pecuniary award (to the degree that it is distinct) appears to be a windfall by sheer virtue of its size, we defer to the jury's conclusions drawn from the evidence before them. Bennett experienced a drastic reversal of fortune as a result of his arrest and termination, one that a jury might reasonably find particularly harsh for a man who had been scrupulous in his personal savings and work ethic. The jury apparently concluded that Bennett's arrest and its lingering effect on his ability to get a job and to present himself with the dignity to which he was accustomed and habituated was a profound injury to his well-being. Without evidence of any error on their part, we decline to upset their decision.

Turning to the Appellants' challenge to the pecuniary damages portion of the compensatory damages award, they argue that Bennett's projected future earnings were estimated "by speculation and conjecture and [were] unsupported by any evidence." Appellants' Br. 41. Bennett was an at-will employee, they accurately note, whose employment with R&L was therefore not guaranteed through his retirement age.

This court has explained, in the context of "front pay" for employment discrimination claims, that future earnings are "nearly indeterminable" where an employee's capacity for work has not been "destroyed or damaged." Duke v. Uniroyal, Inc., 928 F.2d 1413, 1423 (4th Cir. 1991). Duke also notes, however, that

44

"If a plaintiff is close to retirement front pay may be the only practical approach." Id. at 1424. At the time of the trial, Bennett was approximately 11 and a half years from full retirement age, had a high school education, and had 30 years experience in the freight industry. The future earnings estimates provided to the jury were, of course, just that – estimates. We do not discern an abuse of discretion in allowing these estimates to go before the jury when Bennett's work history indicated an employee who wanted to work, was competent, and had every incentive to remain in good standing at R&L until he was able to retire. See 744 F. Supp. 2d at 534 ("The lost future earnings damages awarded, though certainly not established to a mathematical certainty, were proven to a reasonable certainty and were grounded upon facts specific to Bennett."). Unlike Baker v. Kroger, 784 F.2d 1172 (4th Cir. 1986), in which we rejected a future earnings award estimated for 35 remaining years of work as too speculative, Bennett was facing just over ten years before Social Security eligibility. There is no evidence in the record that he would have left R&L before retirement or been forced out of a job that was in the field of his expertise and that had afforded him great financial security. Under these circumstances, we conclude that the district court did not abuse its discretion in allowing

estimated future earnings to be presented to the jury and taken into account as to the compensatory damage award.

## III.

For the forgoing reasons, we hold that the district court did not err in denying the Appellants' motions under Fed. R. Civ. P. 50(b) and 59. In light of the patent and admitted unreliability of all informants who were questioned during the Appellants' brief, indeed pell-mell investigation, there is adequate evidence in the record supporting the jury's findings that the Appellants lacked probable cause to initiate a criminal prosecution against Bennett, and that they undertook this act with malice. In addition, we hold that the trial court properly applied Virginia law as to the legal import of a nolle prosequi order.

Furthermore, we hold that the damages awarded to Bennett do not shock the conscience because they rest upon reasonable estimates of pecuniary and non-pecuniary loss and comport with Virginia's statutory limits and standards as to punitive damages. To be sure, the jury plainly, even generously, expressed its belief that the Appellants visited a grievous pecuniary and dignitary harm on Bennett, effectively wiping out his modest retirement savings, consigning him to the unemployment rolls for an extended period of time and subjecting

46

him to the proverbial "perp walk" before former subordinates in the work place. More disturbing still, they prompted his jailing, even if for only a brief time. For some people, Lowrey and Spangler, for example, getting arrested might appear to be a "no big deal" incident of adult life. But the jury was entitled to consider, as it clearly did, that for some others, Bennett, for example, it is just short of a psychic brutalization. Cf. Florence v. Board of Chosen Freeholders of County of Burlington, 566 U.S. ---, 2012 WL 1069092 (2012) (holding that strip searches of any and all arrestees housed in general population of local detention centers and jails are constitutionally permissible); id., slip op. at 1 (Alito, J., concurring) (describing potential "offensive and deeply humiliating" procedures facing those arrested for minor offenses); id., slip op. at 3, 5 (Breyer, J., dissenting) (same).

We cannot know, from the cold appellate record, what the jury saw on the faces of Bennett or McGinnis and the other witnesses, or what they heard in the tenor and tone of the voices of Bennett or McGinnis or those other witnesses, or what and how such demeanor evidence that is a part of every trial was weighed and evaluated. The experienced, distinguished district judge was a percipient witness of all that occurred before him. The well-established limits to our institutional role requires that, in the absence of a manifest abuse of the broad discretion

47

the law accords to the judgment of the district court, we must

forebear.[10]

For the reasons set forth therefore, the judgment is

AFFIRMED.

---

[10] We respect the conscientiously-held, contrary views as to the weight, credibility and overall probative value of the evidence in this case as well-stated by our good colleague in dissent. For the reasons we express, however, in looking through the trial court's assessment of the record to determine, for ourselves, with appropriate deference, see ABT Bldg. Prods. Corp., 472 F.3d at 113, whether substantial evidence (direct and circumstantial) supports the judgment, we perceive rationality, not an exercise of arbitrary power, in the results reached by jury.

Three of the dissent's observations merit a brief response. First, one will scan Appellants' briefs in vain for any mention of "common carrier" or of the existence of any special public policy of the Commonwealth that should have informed the trial of this case. If the Commonwealth's public policy wrapped common carriers in the kind of protective embrace from malicious prosecution claims favored by the dissent, see Post at 49-50, one would have thought that, rather than removing this case on the basis of diversity of citizenship jurisdiction from state court to federal court and then asking the district court to certify questions to the Supreme Court of Virginia, as they did here, Appellants would have chosen to try the case where it was filed: in the courts of the Commonwealth. We do not believe public policy contributes to the resolution of this appeal.

Second, the dissent's assertion that the mere fact that "Lowrey possessed one of the stolen computers confirmed his statement that he was involved in the theft, and, by extension, his version of the events," see Post at 55 (emphasis added), simply defies what we know about human behavior, including the human capacity for mendacity.

Third, the dissent (weighing the trial evidence for itself) is confident that the only "motive" harbored by McGinnis was "to see the guilty punished." See Post at 60. To the contrary, we are persuaded that the district court did not err in sustaining the implicit finding of the jury, amply supported by the direct and circumstantial evidence in the record, that McGinnis was motivated to see someone punished.

48

AGEE, Circuit Judge:

Virginia courts have long held, and continue to reaffirm, that malicious prosecution actions are disfavored. As Virginia's highest court recently explained, "[a]ctions for malicious prosecution arising from criminal proceedings are not favored in Virginia and the requirements for maintaining such actions are more stringent than those applied to other tort cases to ensure that criminal prosecutions are brought in appropriate cases without fear of reprisal by civil actions." Lewis v. Kei, 708 S.E.2d 884, 889 (Va. 2011); see also Reilly v. Shepherd, 643 S.E.2d 216, 218 (Va. 2007) (same); Bill Edwards Oldsmobile, Inc. v. Carey, 244 S.E.2d 767, 771 (Va. 1978) (same). The reason for this intentionally high bar is that "criminal prosecutions [are] essential to the maintenance of an orderly society." Reilly, 643 S.E.2d at 219 (citing Ayyildiz v. Kidd, 266 S.E.2d 108, 110-11 (Va. 1980)).

Furthermore, malicious prosecution actions against common carriers, like R&L here, are particularly problematic. As the Supreme Court of Virginia recognized more than one hundred years ago:

> [C]haracter [should not be] put lightly in jeopardy, . . . but it is to be borne in mind that in the interest of good order and society, and the upholding and enforcement of good citizenship, prosecutors of wrongdoers are not to be deterred from doing their duty to the public by the fear of being mulcted in heavy damages because of honest mistakes made in

instituting criminal prosecutions. <u>Public carriers of freight are held to be insurers of goods committed to them for shipment and, if they were lightly to be mulcted in damages in every case in which an attempt to punish and thereby stop theft fails, an intolerable burden would be added to those they are rightly called upon to bear.</u>

So. Ry. Co. v. Mosby, 70 S.E. 517, 521 (Va. 1911) (emphasis added).

The majority fails to adhere to—or even refer to—these long-standing and clearly-expressed principles of Virginia law. Instead, it allows a jury verdict to stand that conflicts with these principles. Even taken in the light most favorable to Bennett, the prevailing party below, the facts of this case simply do not support the jury's finding that Bennett met his burden of showing two elements of his claim: a lack of probable cause and malice. Accordingly, I would reverse the judgment of the district court.

Additionally, I disagree with the majority's conclusion that the damages here were supported by the evidence. Most notably, the record lacks any evidence supporting a finding of actual malice as required for the imposition of punitive damages. Likewise, as to the jury's award of more than $1.1 million in non-pecuniary compensatory damages, the amount is unsupported by the facts adduced at trial, unprecedented in Virginia for this type of claim, and clearly reflects that the jury awarded damages based on "passion . . . or prejudice, or .

50

. . that [the award] is not the product of a fair and impartial decision." See Shepard v. Capitol Foundry of Va., Inc., 554 S.E.2d 72, 75 (Va. 2001).

For these reasons, I respectfully dissent.

I. Liability

As correctly stated by the district court below and by the majority opinion, a malicious prosecution action in Virginia requires the plaintiff to prove "four essential elements: that the prosecution was (1) malicious, (2) instituted by or with the cooperation of the defendant, (3) without probable cause, and (4) terminated in a manner not unfavorable to the plaintiff." Maj. Op. at 3 (quoting Reilly, 643 S.E.2d at 218). Defendants concede that the second element is established, and I agree with the majority's analysis in Section II-C regarding the fourth. See Maj. Op. at 35-39. I part ways with the majority, however, in its conclusions that there was sufficient evidence from which the jury could find either a lack of probable cause or legal malice.

A. Probable Cause

As to the element of probable cause, the majority quotes extensively from the district court's opinion, adopting the lower court's analysis regarding both probable cause and the application of the informant-accomplice doctrine. Both the

51

district court's opinion and the majority opinion err in several critical respects.

First, contrary to the majority's reasoning, under Mosby, McGinnis was permitted to credit Lowrey's testimony that Bennett was involved in the theft of the computer towers, and also permitted to credit Spangler and Mitchell's statements that Bennett was responsible for the theft.

The district court and majority refer to the "accomplice" rule, and further state that "[t]he discussion of Spangler and Mitchell under Mosby . . . is misplaced because neither Spangler nor Mitchell implicated themselves as Bennett's accomplices." Maj. Op. at 23. But Mosby's analysis was not so limited. In Mosby, there were two individuals who reported suspicious behavior by Mosby to the company's investigator. 70 S.E. at 518-19. One directly accused Mosby of being involved in a theft ring, and also admitted his own participation in the crime. Id. at 518. As to him, the Mosby court stated what the district court here referred to as the "accomplice" rule, i.e., "that information received from one admitting his participation in a crime is sufficient to create probable cause for prosecution, if there is no reason to doubt its truth." Id. at 521. But a second individual who was not an accomplice, but simply another employee, also gave information implicating Mosby. In referring to the accomplice and the second individual, the Mosby court

52

referred more generally to the fact that an investigator may rely on "sources [of] information," where he did not know that the sources "were not reliable." Id. This was true even though the accomplice was a "notorious thief and wholly unworthy of belief" and the non-accomplice company employee had a "treacherous memory." Id. at 520. Thus, under Mosby, the mere fact that Spangler and Mitchell were not admitting their participation in a crime does not mean that McGinnis could not credit their statements, or that their statements did not help to establish probable cause. See also Lewis, 708 S.E.2d at 890 ("Police may rely on the statement of a reported eyewitness as establishing probable cause to seek an arrest. See Reilly, 643 S.E.2d at 218-19 (finding that probable cause existed when the arresting officer obtained a warrant based on a positive identification of a suspect by an eyewitness). . . . "). In Lewis, in fact, the police officer relied solely on an eyewitness who reported that Lewis attempted to kidnap a child, and did not conduct any investigation in the case. Id. The Supreme Court of Virginia held that evidence established probable cause as a matter of law. Id.

Second, I disagree with the majority's conclusion that the focus should be on the reliability vel non of an informant, rather than the reliability of the information provided by him. The majority suggests that none of the statements of any of

53

these men could be reasonably relied on by McGinnis because he already believed them to be "liars." But even accepting, as we must on appeal, that McGinnis thought Spangler, Mitchell, and Lowrey were "liars" in general, or were minimizing their own involvement in the thefts of either the laptops or the computer towers, that is insufficient alone to negate the existence of probable cause. The mere fact that an accomplice is lying about some aspects of his own involvement in a crime does not render his statement that another person was involved necessarily untrustworthy. That is, it is entirely possible that even a person who is generally untrustworthy in some endeavors will give accurate and trustworthy information in another setting. Cf. Mosby, 70 S.E. at 520-21. Indeed, if an individual had to be absolutely trustworthy in order for his statement to be credited, virtually no accomplice would ever qualify, since by definition, an accomplice is a criminal.

Both of these errors by the majority distort the legal significance of the evidence actually before the jury. That evidence shows that there were three individuals telling McGinnis that Bennett perpetrated a theft. While there may have been reasons to doubt the reliability of Lowery generally, there was nothing known to McGinnis that should have caused him to doubt Lowrey's particular accusations against Bennett. Similarly, while McGinnis may have had reason to believe that

54

Mitchell and Spangler were involved in the theft of laptops, that alone is insufficient to lead him to believe that the information they were providing about Bennett was necessarily false or unreliable.

Moreover, other Virginia cases bolster the conclusion that there was probable cause here. The majority opinion unconvincingly attempts to distinguish Reilly, Bill Edwards, and Commissary Concepts Mgmt. Corp. v. Mziguir, 594 S.E.2d 915 (Va. 2004), on the grounds that in the case at bar "there was not a scintilla of corroborating physical evidence or any pattern of behavior already observed by the employer . . . ." Maj. Op. at 29. In fact, however, McGinnis had "corroborating physical evidence"—he recovered one of the stolen computers from Lowrey. The fact that Lowrey possessed one of the stolen computers confirmed his statement that he was involved in the theft, and, by extension, his version of the events, which included the statement that Bennett was also involved.

The majority dismisses these cases as ones that "involve far stronger evidence of the suspect's wrongdoing" than the instant case, Maj. Op. at 27; however, that is a mischaracterization. In Mziguir, for example, the court concluded that probable cause existed to believe an employee was embezzling despite the fact that the supposedly "missing" money had actually been placed by the employee in the restaurant safe,

55

and simply had not been discovered by management. 594 S.E.2d at 917-18. Indeed, rather than asking the employee where the money was, the company simply asked the police to arrest him. Id. at 917. After he was arrested, he was able to explain to company employees exactly where in the safe the money was, and the charges were dismissed. Id. Despite the fact that a simple question to the employee or a thorough search of the safe would have revealed—and ultimately did reveal—the employee's innocence, the Supreme Court of Virginia nonetheless found that there was probable cause as a matter of law to ask for his arrest. Id. at 918. Thus, the Court concluded that the trial court erred in denying the motion to set aside the jury verdict. Id.

Similarly, the district court and majority here fail to recognize the significant evidence McGinnis had before him, which was sufficient to establish "probable cause." Even if there was additional information in existence (but unknown to McGinnis) that could have undercut the accusations against Bennett, that information does not undercut probable cause. McGinnis might have been more thorough in his investigation, just as the employer in Mziguir could have been. As with most investigations viewed through the lens of hindsight, there was more relevant information he could have learned, but the majority rightly acknowledges that the failure to discover those

facts "could not be considered by the jury in deciding the element of lack of probable cause." Maj. Op. at 27. Three different people implicated Bennett (one of whom was an accomplice) and the accomplice then produced tangible evidence supporting his story that he was involved in the theft. In my view, probable cause existed as a matter of law,[1] and the district court erred in construing Virginia law to the contrary.

B.  Malice

The final element of a malicious prosecution claim that a plaintiff must prove is that the defendant acted with "legal malice." This type of malice is distinct from the "actual malice" required for the imposition of punitive damages. See Giant of Va., Inc. v. Pigg, 152 S.E.2d 271, 276-77 (Va. 1967). In the context of a malicious prosecution claim, legal malice is "any controlling motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal

---

[1] While it could not be considered as evidence of probable cause by the jury since it occurred after Bennett's arrest, it is nonetheless telling that an impartial state court judge, after hearing the testimony of Lowrey and the findings of McGinnis' investigation, found there was probable cause to certify to the grand jury the criminal proceedings against Bennett. See Mosby, 70 S.E. at 520-21 (noting that "the police justice and two grand juries" who returned bills of indictments against Mosby "gave credence to the evidence of both [accomplices], as [the investigator] had done" and that the investigator's belief that the plaintiff was guilty was "shared in by the police justice and two grand juries").

57

laws, suppress crime, or see that the guilty are punished."
Hudson v. Lanier, 497 S.E.2d 471, 473 (Va. 1998) (emphasis in
original). Thus, it requires the "intentional doing of a
wrongful act with an evil or unlawful purpose" and must be
proven separately. Freezer v. Miller, 176 S.E. 159, 168-69 (Va.
1934) (emphasis in original). Malice can be inferred from
probable cause, but only where the circumstances of the case
warrant it. See id. Indeed, the majority apparently agrees that
such an inference is possible only where the circumstances of
the case warrant it. See Maj. Op. at 31-32 (citing Pigg, 152
S.E.2d at 276; Oxenham v. Johnson, 402 S.E.2d 1, 2 (Va. 1991)).

Notably, after quoting extensively from the district
court's ruling regarding legal malice, the majority concludes
that McGinnis's decision to press charges against Bennett
"solely on the basis of information from informants he
considered unreliable and deceptive, along with his failure to
seek the most basic corroborating information for these
accounts, supports a jury finding as to malice." Maj. Op. at 35.
This conclusion fails to follow Virginia law concerning legal
malice, which clearly holds that "neither lack of probable cause
nor the mere failure to act as a reasonably prudent man under
the circumstances in instituting the prosecution is the same
thing as malice." Freezer, 176 S.E. at 168. As explained in
Freezer, the circumstances of the case will warrant an inference

58

of malice from a lack of probable cause only where there is "no reasonable ground for the institution of a prosecution." Id. at 169 (emphasis in original). This is so because legal malice requires a "wrong motive or purpose [which] must be proved as a fact and will not be imputed by the law from the mere intentional doing of a wrongful act without legal justification or excuse." Id. (emphasis in original).

Virginia cases applying these principles show that more is required than what is present in the case at bar. In Hudson, for example, the Supreme Court of Virginia required proof of ill motive in a malicious prosecution case. 497 S.E.2d 471. The trial court had dismissed the action at the close of evidence on the grounds that the plaintiff failed to prove that either individual defendant acted with malice. The Supreme Court of Virginia affirmed the circuit court's conclusion that there was insufficient proof of malice, because the plaintiff had failed to prove that either defendant "had a controlling motive other than to 'further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished.'" Id. at 473 (citing Freezer, 176 S.E. at 169 (emphasis in Freezer)). Similarly, in Freezer, the Supreme Court of Virginia explained that "[e]ven if there was no probable cause for the prosecution, but it is shown there was in fact no wrongful motive, the action for malicious prosecution cannot be

59

maintained, and a verdict for the plaintiff will be set aside." 176 S.E. at 170.

The facts of this case, similarly, do not warrant an inference that malice was present, and there is no independent evidence of wrongful intent or any other improper "controlling" motive by Defendants. It is undisputed that McGinnis had never met Bennett before the investigation, and Bennett admitted that he never heard Finley say anything derogatory about him. See Reilly, 643 S.E.2d at 218 (noting, as to the malice element, that there was "no contention that [the investigator] had any personal ill-will against [the plaintiff] or that [the investigator] had even known or heard of him before the case was assigned to him for investigation"). Moreover, there was no evidence offered of any motive by McGinnis other than a motive to see the guilty punished. See Hudson, 497 S.E.2d at 473.

The decision in Pigg, is instructive as to when the circumstances of a case can warrant a finding of malice. There, the Supreme Court of Virginia concluded that the lack of probable cause before it was sufficient to support a finding of malice for purposes of liability, but the conduct of the defendant in that case was far more egregious than the facts of the case at bar. 152 S.E.2d 271. In that case, a store employee tasked with apprehending shoplifters flatly refused to consider the plaintiff's explanation that she had purchased items earlier

60

in the day and the receipt was in her car. He refused to even go to the car (which was in the store parking lot) and examine the receipt. Instead, he arrested her, escorted her to a nearby police precinct and swore out a warrant charging her with petit larceny. Id. at 273-74. There, despite the plaintiff inviting an inquiry into her innocence and offering a plausible explanation for her having the items in her purse, there was no investigation conducted.

Here, by contrast, R&L brought in an investigator, who spent days reviewing records and interviewing numerous people, several of whom implicated Bennett. Additionally, one of the witnesses who implicated Bennett not only admitted his own participation in the crime, but produced corroborating physical evidence to back up his story (a stolen computer tower). Unlike in Pigg, there was no flat, blanket refusal here to consider the plaintiff's potential innocence.

Moreover, the mere fact that Bennett proclaimed he was innocent does not alter this result. The malicious prosecution plaintiff in Mosby likewise emphatically denied any guilt, but the court nonetheless concluded that there was probable cause to have him arrested. 70 S.E. at 520 ("Taking [Mosby's proclamations of innocence] and considering them in connection with information [the investigator] then had, we cannot agree that they were so convincing of [his] innocence that a

61

reasonably prudent man should have desisted in his purpose to have him arrested."). In short, no inference of legal malice is warranted under the facts of the case at bar.

I would therefore conclude that Bennett failed to establish both a lack of probable cause and malice, and that the jury's verdict should be overturned.

II. Damages

Because I would reverse the judgment of the district court as to Defendants' liability, I would not find it necessary to address any of Defendants' challenges to the damages awards. Nonetheless, because the majority reaches those issues, I will set out two aspects of the district court's approval of the verdict and majority's analysis that I believe to be error.

First, the jury's award of non-pecuniary damages in the amount of more than $1.1 million is wholly unsupported by the evidence and "shocks the conscience." Accordingly, I would vacate that portion of the compensatory damages award.[2] Second, because Plaintiff has not satisfied the standards under Virginia

---

[2] At trial, Defendants briefly cross-examined Bennett, and offered no evidence of their own to contest the pecuniary damages sought. Although the evidence supporting the jury's pecuniary damages award was minimal, see J.A. 589 (district court admonishing plaintiff's counsel for being unable to clearly explain or identify the damages), I nonetheless conclude that it was sufficient under the standard of review, assuming there was liability on the part of the defendants.

law for an award of punitive damages, I would vacate the jury's award of punitive damages.

A.    Non-pecuniary Compensatory Damages

The jury awarded over $1.1 million for non-pecuniary damages to Mr. Bennett, in addition to more than $500,000 in pecuniary losses.[3] The district court acknowledged that the non-pecuniary award was "large." J.A. 746. Likewise, the majority describes the award as "the jury plainly, even generously, express[ing] its belief that the [Defendants] visited a grievous pecuniary and dignitary harm on Bennett . . . .," Maj. Op. at 46, and acknowledges that the award "appears to be a windfall by sheer virtue of its size." Maj. Op. at 44. The majority nonetheless concludes that the jury's award was not so great as to "shock the conscience [or] create the impression that the jury has been motivated by passion, corruption, or prejudice" and that it was no "so out of proportion to the injuries suffered as to suggest that it is not the product of a fair and impartial decision." Shepard v. Capitol Foundry of Va., Inc.,

---

[3] As noted by the majority, the jury was not asked to provide a breakdown of its damages award by category. Maj. Op. at 43. The district court assumed the jury had given the full amount sought by Plaintiff for pecuniary damages and then attributed the rest of the award to non-pecuniary damages. The pecuniary damages included lost past and future wages, and the amounts Bennett used from his retirement account and annuity fund.

554 S.E.2d 72, 75 (Va. 2001) (quoted in Maj. Op. at 39). I disagree and would hold the district court abused its discretion in refusing to vacate the non-pecuniary damages award.

As a preliminary matter, while I fully recognize that Virginia does not employ an "average verdict rule" to determine the excessiveness of a damage award, see John Crane, Inc. v. Jones, 650 S.E.2d 851, 858 (Va. 2007), it is noteworthy that the award here is substantially higher than any malicious prosecution damage award affirmed by the Supreme Court of Virginia in the past one hundred years, if not in that Court's history. As Defendants note in their brief,[4] from 1911-2011, the Supreme Court of Virginia heard and decided 42 malicious prosecution cases involving monetary awards. Of those cases where the award was affirmed, the highest award of compensatory damages ever affirmed was in 2011, in the amount of $185,000. See Br. of Appellants at 3-4 & Addendum A (citing O'Connor v. Tice, 704 S.E.2d 572 (Va. 2011)). Even more significantly, the total compensatory damages awards in all of those cases affirmed during that same 100-year period equaled $249,850. The compensatory damages awarded here was almost seven times the combined amount of all affirmed awards in a century.

---

[4] This summary of case information was compiled by Defendants, but Bennett has not been challenged its accuracy.

64

Setting aside any comparison to other awards, the amount here is plainly excessive and shocks the conscience because it is so disproportionate "to the injuries suffered so as to suggest that it is not the product of a fair and impartial decision." Shepard, 554 S.E.2d at 75. Indeed, the evidence of humiliation, pain and suffering, and other emotional damages, was practically non-existent in the case at bar, and certainly insufficient to support an award of over $1 million. See Gazette, Inc. v. Harris, 325 S.E.2d 713, 745 (Va. 1985) (holding $100,000 compensatory damage award excessive as a matter of law where libel plaintiff "experienced no physical manifestation of any emotional distress[,] . . . sought no medical attention for any condition resulting from the publication, [and there was] no evidence that [his] standing with his peers was diminished as the result of the libel"); cf. Schnupp v. Smith, 457 S.E.2d 42, 49-50 (Va. 1995) (allowing $200,000 non-pecuniary damages award to stand, but detailing specific injury to reputation and detailed information regarding the effect of the defamation on plaintiff and his family); see also Sloane v. Equifax Info. Servs., LLC, 510 F.3d 495, 503 (4th Cir. 2007) (summarizing and setting forth various factors properly considered in determining the potential excessiveness of an award for emotional distress, including the context in which the distress arose, corroborating testimony, the nexus between the conduct of the defendant and

65

the emotional distress, mitigating circumstances, physical injuries as a result of the distress and medical attention resulting from it, psychiatric or psychological treatment and loss of income) (citation omitted).

In this case, there was no evidence that Bennett suffered any physical symptoms at all as a result of his alleged distress. He never saw a physician, therapist or counselor, or sought other psychiatric treatment. He never took any medicine. He expressly admitted that he did not know of anyone with whom his reputation had been harmed. His testimony regarding how he felt about what had occurred or about how it had affected him, emotionally or physically, was limited to the rather conclusory testimony that he was "humiliated, embarrassed and felt betrayed by [his] employer." J.A. 562. While the district court ultimately affirmed the jury verdict, it also acknowledged the paucity of the evidence regarding harm to reputation. J.A. 586 (district court: "that is about as thin as evidence as you could have . . . Why is it you try a case and put on no damages? I don't understand it.").

Additionally, the entirety of the "corroborating evidence" here came from Bennett's two brothers, who testified with incredible brevity that Bennett was a changed person, and that he used to be "happy, easy going, [and] fun," but after the criminal proceedings, he was "not the same," "quiet" and

66

"subdued." J.A. 559, 560. Why Plaintiff's counsel decided not to question them more extensively, and why Plaintiff himself did not testify more fully as to his damages, are not for us to determine.[5] It is sufficient that, on the record before us, there is no evidence that would lead an impartial and fair jury to conclude that an award of $1.1 million for non-pecuniary damages (in addition to more than a half-million dollars in pecuniary damages) was warranted.

Contrary to the majority's implication, Maj. Op. at 46-47, I do not suggest that a false arrest could never traumatize a person or entitle them to a large award, and we can speculate that events may well have greatly affected Bennett. But that is all we would be doing—speculating. Likewise, that is what the jury impermissibly must have done because the evidence is simply not there to support its verdict. The majority's description of the arrest here as "just short of a psychic brutalization," Maj. Op. at 47, is wholly unsupported by any testimony from Bennett or anyone else that it had that effect on <u>him</u>. Quite simply, Plaintiff failed to put forth sufficient evidence of emotional

---

[5] While it may be uncomfortable for a plaintiff to discuss his feelings, emotional difficulties, or emotional pain in front of a courtroom of strangers, when he seeks vast amounts of money for mental anguish and suffering, he must offer sufficient evidence to support any such award. The award here was not so supported and I would not allow it to stand.

pain or suffering so as to justify an award of more than $1 million for non-pecuniary damages.

B.   Punitive Damages

I also would vacate the award of punitive damages, both because there has been no showing of actual malice and because it is excessive.

As the majority notes, this Court has held that a Virginia malicious prosecution plaintiff must prove his entitlement to punitive damages by clear and convincing evidence. Stamathis v. Flying J., Inc., 389 F.3d 429, 440 (4th Cir. 2004).[6] The punitive damages award here cannot stand, because the record is devoid of any evidence of actual malice by Defendants, let alone clear and convincing evidence. The majority misstates and misapplies Virginia law in suggesting that mere negligence in an investigation can establish actual malice. Maj. Op. at 42 (relying on Oxenham, 402 S.E.2d 1). Virginia law has never held that common negligence could support the imposition of punitive damages. Rather, the negligence or recklessness must be of such a character as to "evince a conscious disregard of the rights of others." Oxenham, 402 S.E.2d at 5. Again, for reasons similar to

---

[6] Neither party has cited to a Virginia case clearly stating that this is the proper standard for an award of punitive damages for malicious prosecution. Plaintiff, however, does not challenge that this is the proper standard and so for purposes of this opinion I will presume it applies.

68

those discussed in Sections I-A and I-B supra (addressing elements of probable cause and legal malice), the record does not contain evidence of actual malice, which is required to support an award of punitive damages.

Indeed, even in cases where legal malice sufficient to impose liability is found, the Supreme Court of Virginia has refused to impose punitive damages absent a much stronger showing as to actual malice than that present in the case at bar. In Pigg, for example, the Supreme Court of Virginia upheld the jury's finding as to liability, but reversed the award of punitive damages, finding no actual malice. The Court reasoned:

> There is no evidence that [the defendants] acted with actual malice, or with evil purpose, or a spirit of mischief, in causing the arrest of Mrs. Pigg. They did not know her, and there is no showing of personal animosity, ill will, rudeness, or oppression, and actual malice cannot be inferred from a showing of want of probable cause. Here the jury inferred, as it had a right to do, that lack of probable cause and the circumstances, including the refusal of [the employee] to go to her car and examine her sales slip showing a prior purchase of the merchandise involved, constituted legal malice. But the fact that [the employee] was not performing his duty in a reasonable way cannot be blown up to show that he was guilty of actual malice. Consequently, the evidence does not warrant the award for punitive damages.

152 S.E.2d at 277.

The same is true here. While the majority repeatedly casts aspersion on McGinnis' investigation (characterizing it as "brief," "pell-mell" and "ham-handed," Maj. Op. at 29, 46),

69

these characterizations cannot contort the evidence in the record to the level required for a finding of actual malice. McGinnis spent several days conducting more than ten witness interviews. He reviewed documentation and apparently tried to ascertain what had occurred and to convince individuals with knowledge to come forward or to confess. He may have reached an incorrect conclusion. Particularly with the benefit of hindsight, he could have performed a more thorough investigation. But at most he was negligent; conduct which does not meet the standard for actual malice. See Pigg, 152 S.E.2d at 277. To hold him and R&L liable for punitive damages is not supported by the record and is contrary to Virginia law.

III. Conclusion

If we assume that Bennett was merely a victim here, the primary perpetrators of the wrong against him were not Defendants, but were Lowery, Spangler, and Mitchell, who falsely implicated Bennett in a theft he claims he did not commit. Any harm visited upon Bennett thus rests squarely upon their shoulders, not upon the Defendants'. At the time Defendants elected to call the police, McGinnis had three individuals reporting to him that Bennett committed the theft. He was permitted to rely on their statements in reporting to the police that he believed Bennett had committed theft. At the time the investigation was handed over to the police—with probable cause

70

to believe Bennett had committed the theft—Defendants had no further obligation to Bennett. Under Virginia law, they should not be held liable for malicious prosecution and be subject to an excessive award of compensatory damages and punitive damages solely for what was, at worst, an incomplete investigation.

Based on this record, I am firmly of the view the Supreme Court of Virginia would find the applicable standards for proof of malicious prosecution, and certainly damages, were not met in this case. I respectfully dissent.